Present:  Hassell, C.J., Lacy, Keenan, Koontz, Lemons, and
Agee, JJ., and Russell, S.J.

LEON JERMAIN WINSTON

v.  Record Nos. 040686 &      OPINION BY JUSTICE DONALD W. LEMONS
              040687               November 5, 2004

COMMONWEALTH OF VIRGINIA

              FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
                    Mosby G. Perrow, III, Judge

    In these appeals, we consider three capital murder

convictions and three death sentences imposed upon Leon Jermain

Winston, along with his convictions upon two counts of

attempted robbery, statutory burglary, malicious discharge of a

firearm, and five counts of use of a firearm in the commission

of a felony.

                    I.  Facts and Proceedings Below

                          A.  Background

    On the morning of Friday, April 19, 2002, Rhonda and

Anthony Robinson ("Rhonda" and "Anthony") were shot and killed

in their home at 410 Sussex Street in Lynchburg.  When police

arrived, they found that the rear door to the house had been

forcibly opened.  Anthony's body was at the foot of the stairs

and five 9-millimeter shell casings were found around and under

his body.  Rhonda's body was found on the floor of the upstairs

bedroom shared by her two daughters.  Four 9-millimeter shell

casings were found upstairs.

1

Autopsies were performed on both Rhonda and Anthony. Toxicology reports found no indication of alcohol, opiates, or cocaine in either. The medical examiner concluded that all wounds were inflicted upon both victims while they were alive. The medical examiner also concluded that Rhonda was pregnant at the time she was murdered.

Anthony died from blood loss caused by eight gunshot wounds to his head, chest, abdomen, and upper and lower extremities. In numbering the bullet wound tracks, the medical examiner did not indicate the sequence in which Anthony was shot. However, the medical examiner established that a 9-millimeter semi-automatic handgun caused tracks 1 through 7 and a .38 caliber revolver caused track 8.

The bullet in track 1 entered Anthony's head above and behind his left ear, passed through his skull causing a "large amount of destruction" before exiting through his right eye. The bullet in track 2 entered Anthony's right jaw and exited out of his mouth. The bullet in track 3 grazed the surface of Anthony's left cheek before it entered his chest, damaged his left lung and heart, and stopped in his abdomen. The bullet in track 4 passed front-to-back through Anthony's right shoulder. The bullet in track 5 passed from right to left through the subcutaneous tissue of Anthony's abdomen. The bullet in track 6 entered Anthony's left upper back, and then passed through

2

his ribs, left lung, heart, liver, and stomach.  The bullet in track 7 entered Anthony's right thigh and then passed through it.  The .38 caliber bullet in track 8 entered the right side of Anthony's groin at the base of his penis, and passed through the left scrotal sac before lodging in his left thigh.

Rhonda's death was caused by blood loss due to eight gunshot wounds.  The medical examiner identified three wound tracks associated with these wounds.  The bullet that caused the first wound track entered at the top of her head and passed through her forehead.  The bullet that caused the second wound track passed through Rhonda's chin into her neck and chest, where it hit major blood vessels before exiting through her back.  The bullet that caused the third wound track passed through Rhonda's neck.

Evidence at trial revealed that on the morning of April 19, 2002, then eight-year-old Niesha M. Whitehead was awakened by Rhonda, her mother, calling out that "someone is in the house."  Niesha saw two black men outside the second floor bedroom she shared with her sister, Tiesha, then five years old.  Niesha testified that she saw her stepfather, Anthony, go downstairs with one of the two men.  This man was dressed in black clothing and wore gloves.  Niesha called him "Mr. No Name."  She testified that "Mr. No Name" had a tattoo that looked like "a big dog."  Significantly, Winston concedes that

3

he was present on this evening, but asserts on brief before us that he did not shoot anyone. As between Winston and the other man who was an intruder in the home, Kevin Brown ("Brown"), Winston is the person with a tattoo of a dog on his arm. Niesha testified that after Anthony went downstairs with "Mr. No Name," she heard shots.

Brown, who Niesha called "Mr. No Name's Friend," stayed upstairs with Rhonda until "Mr. No Name" came back upstairs. "Mr. No Name" chased Rhonda into the girls' bedroom and shot Rhonda in front of the girls. Niesha led her sister to a closet where the two girls hid. Later, Niesha left the closet and discovered the bodies of her mother and stepfather.

A cab driver testified that he picked up two black males, one of whom he identified as Brown, in the early morning hours of April 19, 2002. He drove the men to several homes where the two men would leave the cab and walk around the house checking the windows, but not entering the houses. He remembered that one of the houses was on Sussex Street. The Robinson home was on Sussex Street.

Michelle Lipford, who had purchased drugs from Winston and Brown in the past and had been sexually intimate with Winston, testified that at about 5:00 a.m. on April 19, 2002, she drove Winston and Brown to the Robinson's home on Sussex Street. She testified that she parked a block away from the Robinson home

4

and Winston and Brown left the car for approximately 5 minutes and then returned.  They went to her home on Pierce Street.  Winston and Brown asked her to drive them back to Sussex Street.  She complied and parked a block away from the Robinson home.  Winston and Brown got out of the car.  After about 15 minutes, Lipford heard gunshots and drove away.

Tranika Turner, Winston's girlfriend, received a call from Winston at about 6:00 a.m. on the morning of April 19, 2002 asking her to pick him up at a carwash, a short distance from Sussex Street.  She did so.

The evidence revealed that Carrie Wirges, a neighbor of the Robinsons, was awakened by gunshots on the morning of April 19, 2002.  She described hearing three shots and then five shots.

Nathan Rorls ("Rorls"), a longtime friend of Winston's, testified that Winston telephoned him and stated that "he slumped two people down here," meaning that he "murdered somebody; killed somebody."  When Rorls saw Winston the next day, Winston stated that he "killed two people and robbed them and stuff." Winston produced a handgun from under his shirt.  Rorls described it as "a black gun like an automatic [, it] was like a Glock or a nine."  Winston also displayed cash and cocaine that he stated he took from the Robinsons.  He told Rorls that he and Brown took $2000 and two ounces of cocaine.

5

Rorls recited what Winston told him. According to Winston, Brown took Anthony downstairs and shot him first in the stomach. Winston then shot Anthony when he came "running up the steps talking about they robbing us." Rorls testified that,

> So [Winston] said he shot him like up in the
> face or somewhere in the upper body coming up
> the stairs. And he told me, he said, he don't
> want to leave no witnesses, so he turned around
> and he shot that bitch.

Winston told Rorls that he committed these crimes because he had been robbed several days earlier and "he needed to make his money back up, he didn't get paid." Rorls also stated that Winston told him that Rhonda was pregnant.

Winston was arrested at his girlfriend, Turner's, home on April 25, 2002. Turner gave police a set of keys that Winston left in her house. The keys fit locks to doors at two nearby apartments. At one of the apartments, occupied by Robin Wilson, the police recovered a 9-millimeter off-brand handgun manufactured by a company located in Tennessee and made to resemble a Glock. Winston had left the handgun with Wilson to "hold" for him, and had failed to retrieve it before he was arrested. Winston had called Wilson from jail after he was arrested and requested Wilson to continue to "hold" it.

Winston's handgun seized by police at Wilson's apartment had one unspent round in the clip magazine. The cartridge bore

6

the identical stamping as the casings recovered at the Robinson murder scene. A forensic scientist testified at trial that five bullets recovered from the Robinson's home and two bullets removed from Anthony's body were fired from Winston's 9-millimeter handgun recovered from Wilson's apartment. Nine cartridge casings recovered at the crime scene had been ejected from Winston's 9-millimeter handgun. Another forensic scientist testified that biological material recovered from the 9-millimeter handgun matched Winston's DNA profile and was inconsistent with Brown or either of the Robinsons. The probability of a random selection yielding this result was greater than one in six billion.

## B. Proceedings Below

On June 9-13, 2003, Leon Jermain Winston was tried before a jury in the Circuit Court of the City of Lynchburg on indictments charging the capital murder of Anthony Robinson in the commission of robbery or attempted robbery, Code §§ 18.2-30 and 18.2-31(4); capital murder of Rhonda Robinson in the commission of robbery or attempted robbery, Code §§ 18.2-30 and 18.2-31(4); capital murder of Rhonda Robinson during the same transaction in which another person was willfully, deliberately, and with premeditation killed, Code §§ 18.2-30 and 18.2-31(7); two counts of robbery, Code §§ 18.2-10 and 18.2-58; statutory burglary, Code §§ 18.2-10 and 18.2-90;

maliciously discharging a firearm, Code § 18.2-279; and five counts of use of a firearm in the commission of a felony, Code § 18.2-53.1. The trial court granted Winston's motion to strike the charges of robbery, but permitted the case to proceed on charges of attempted robbery.

The jury convicted Winston of all charges submitted to it. In a separate proceeding on June 13, 2003, the jury sentenced Winston to three death sentences for the capital murder convictions, finding both the future dangerousness and vileness aggravating circumstances. The jury sentenced Winston to 73 years imprisonment and $400,000 in fines upon the remaining convictions.

On January 29, 2004, the trial court held a post-verdict hearing at which it considered the probation officer's report, additional evidence, and argument of counsel. The trial court imposed three death sentences, the sentences of imprisonment as fixed by the jury, as well as the fines imposed; however, the court suspended the imposition of fines. Winston noted appeals of his convictions on February 26, 2004. Winston's appeals of his non-capital convictions were certified under Code § 17.1-409 for consolidation with the appeals of his capital murder convictions and the review of sentences mandated by Code § 17.1-313.

II. Analysis

8

A.  Issues "Abandoned"

Winston makes 72 assignments of error.[1]  By his own concession in his brief, Winston "abandoned" assignments of error 1, 2, 4, 6, 11, 13, 14, 15, 16, 17, 26, 27, 35, 43, and 59.  He did not brief these assignments of error and has, therefore, waived them.  Rule 5:27; Rule 5:17(c)(4); Elliott v. Commonwealth, 267 Va. 396, 422, 593 S.E.2d 270, 286 (2004); Williams v. Commonwealth, 248 Va. 528, 537, 450 S.E.2d 365, 372 (1994), cert. denied, 515 U.S. 1161 (1995).

B.  Issues Previously Decided

Included in Winston's 72 assignments of error are arguments this Court has rejected in previous cases.  Since we find no reason to modify our previously expressed views on these questions, we adhere to our previous holdings and reject the following contentions:

1) "The trial court erred in denying voir dire on parole ineligibility."  (A.E. 5).  Rejected in Hills v. Commonwealth, 262 Va. 807, 811-12, 553 S.E.2d 722, 724-25 (2001); Lilly v. Commonwealth, 255 Va. 558, 567, 499 S.E.2d 522, 529-30 (1998), rev'd on other grounds, 527 U.S. 116 (1999).

---

[1] The assignments of error are referred to by number throughout the opinion, and are referenced by either "assignment of error" or "A.E."

2) "The trial court erred by not declaring Virginia's death penalty statutes unconstitutional" because the terms " 'vileness' and 'future dangerousness' are unconstitutionally vague and fail to provide the sentencer with meaningful instruction to avoid the arbitrary and capricious infliction of a death sentence."  (A.E. 8, 18, and 65).  Rejected in Jackson v. Commonwealth, 267 Va. 178, 205-06, 590 S.E.2d 520, 535-36 (2004), cert. denied, ___ U.S. ___, ___ S.Ct. ___, 73 U.S.L.W. 3212 (2004) ("future dangerousness"); Wolfe v. Commonwealth, 265 Va. 193, 208, 576 S.E.2d 471, 480, cert. denied, ___ U.S. ___, 124 S.Ct. 566 (2003) ("vileness"); Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert. denied, 522 U.S. 1018 (1997) ("vileness"); Mickens v. Commonwealth, 247 Va. 395, 403, 442 S.E.2d 678, 684, vacated and remanded on other grounds, 513 U.S. 922 (1994) ("future dangerousness").

3) "The trial court erred by not declaring Virginia's death penalty statutes unconstitutional" because "the Virginia scheme fails properly to inform and instruct the jury on its consideration of mitigating evidence."  (A.E. 8, 18, and 65).  Rejected in Walker v. Commonwealth, 258 Va. 54, 61, 515 S.E.2d 565, 569 (1999), cert. denied, 528 U.S. 1125 (2000); Johnson v. Commonwealth, 259 Va. 654, 667,

529 S.E.2d 769, 776, cert. denied, 531 U.S. 981 (2000); Watkins v. Commonwealth, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), cert. denied, 475 U.S. 1099 (1986).

4) "The trial court erred by not declaring Virginia's death penalty statutes unconstitutional" because they allow "the prosecution to prove future dangerousness by evidence of unadjudicated criminal conduct and fail to require the prosecution [to] satisfy any standard of proof before using such conduct." (A.E. 8, 18, 65). Rejected in Green v. Commonwealth, 266 Va. 81, 107, 580 S.E.2d 834, 849 (2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1448 (2004); Satcher v. Commonwealth, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), cert. denied, 507 U.S. 933 (1993); Stockton v. Commonwealth, 241 Va. 192, 210, 402 S.E.2d 196, 206, cert. denied, 502 U.S. 902 (1991).

5) "The trial court erred by failing to conduct a pretrial proportionality review." (A.E. 10). Rejected in Green, 266 Va. at 107, 580 S.E.2d at 849; Bailey v. Commonwealth, 259 Va. 723, 742, 529 S.E.2d 570, 581, cert. denied, 531 U.S. 995 (2000); see also Code § 17.1-313. Winston's assignment of error stating that "[t]he trial court erred when it failed to conduct a proportionality review that included capital cases which did not result in a sentence of death," (A.E. 66), is also without merit because the

11

trial court is not required to conduct a proportionality review.

6) "The trial court erred when it instructed the jury it could infer malice from the use of a deadly weapon and its jury instruction 8 was improper." (A.E. 39). Strickler v. Commonwealth, 241 Va. 482, 495-96, 404 S.E.2d 227, 236, cert. denied, 502 U.S. 944 (1991); Smith v. Commonwealth, 239 Va. 243, 263-64, 389 S.E.2d 871, 882, cert. denied, 498 U.S. 881 (1990).

7) "The trial court erred in giving jury instruction 36," stating that, "You may infer that every person intends the natural and probable consequences of his acts." (A.E. 44). Rejected in Schmitt v. Commonwealth, 262 Va. 127, 145, 547 S.E.2d 186, 199 (2001), cert. denied, 534 U.S. 1094 (2002). See also Strickler, 241 Va. at 495, 404 S.E.2d at 236 (instruction that jury "may infer" malice does not amount to impermissible presumption).

8) "The trial court erred by giving jury instructions 50, 53, 64, 65, 66, and 67" and submitting verdict forms that described future dangerousness as "proof beyond a reasonable doubt of a probability of future acts of violence." (A.E. 56 and 60). Rejected in Mickens, 247 Va. at 402-03, 442 S.E.2d at 683-84.

12

9) "The death penalty is cruel and unusual punishment and it is error to impose such a sentence in contravention of the United States and Virginia Constitutions." (A.E. 72). Rejected in Johnson, 259 Va. at 667, 529 S.E.2d at 776; Jackson v. Commonwealth, 255 Va. 625, 635, 499 S.E.2d 538, 545 (1998), cert. denied, 525 U.S. 1067 (1999); Spencer v. Commonwealth, 238 Va. 275, 280-81, 384 S.E.2d 775, 777-78 (1989), cert. denied, 493 U.S. 1036 (1990).

### C.   Pre-trial Proceedings

### 1.   Appointment of Experts

Winston asserts three assignments of error concerning the trial court's refusal to appoint certain experts to assist him in the case.  First, he asserts the trial court "erred in denying the defense request for a sentencing/mitigation expert." (A.E. 3).  Second, he alleges the trial court "erred in denying the defense request for the appointment of a child psychologist to explore the competence of a nine year old witness." (A.E. 7).  Third, he claims the trial court "erred in denying the defense request for a mental health expert per Ake and Husske." (A.E. 9).

Winston filed a motion requesting a "sentencing/mitigation expert" prior to trial.  In his motion he noted that "[i]ndigent defendants in Lynchburg are often represented by the Office of the Public Defender" and that "[t]he Lynchburg

13

Public Defender has a sentencing specialist on staff."  He argued that a "sentencing specialist has the expertise necessary to locate essential witnesses and data, examine and evaluate testimony and documents using his or her special knowledge of the issues likely to be significant at a murder trial and possible sentencing event, issues beyond the comprehension of the ordinary layman."  In argument on the motion, Winston acknowledged that the services requested involved gathering his background information and could be performed by the previously appointed defense investigator.

The trial court declined to appoint an additional person to be the "mitigation expert" as requested by Winston. Instead, the trial court expanded the range of authorized activities for the investigator who had already been appointed for Winston "to include background investigation for evidence in mitigation."  Although not receiving the particular expert he requested, Winston, in fact, received the services he requested.  While the Commonwealth is required to provide adequate expert assistance to indigent defendants in certain circumstances, it is not required to provide them with "all assistance that a non-indigent defendant may purchase."  Husske v. Commonwealth, 252 Va. 203, 211, 476 S.E.2d 920, 925 (1996), cert. denied, 519 U.S. 1154 (1997).

14

Winston also filed a motion in the trial court seeking the appointment of a psychologist to examine then eight-year-old Niesha Whitehead, one of the daughters of the victims, and requested a hearing to determine her competence to testify. The trial court denied the motion for an examination on the basis that "a determination of the competency of this witness is for the Court, and that can be done without the assistance from an expert."

We review the trial court's decision concerning the competence of Niesha Whitehead with deference. "Because of the opportunity a trial court has to see and observe a child's demeanor on the stand, his or her competence as a witness is a matter within the discretion of the trial court and its ruling will not be disturbed except for manifest error." Mackall v. Commonwealth, 236 Va. 240, 253, 372 S.E.2d 759, 767 (1988), cert. denied, 492 U.S. 925 (1989); Kiracofe v. Commonwealth, 198 Va. 833, 840, 97 S.E.2d 14, 18-19 (1957). Winston made no allegation, either in his motion to the trial court or in oral argument at hearings before the trial court, that Niesha had any special condition, other than being eight years old at the time, that would require the trial court to seek expert assistance in determining her competence to testify. With the use of adequate voir dire, trial courts in the Commonwealth

15

have determined the competence of children younger than eight years old.  See Kiracofe, 198 Va. at 840, 97 S.E.2d at 18-19.

In this case, the trial court's voir dire to determine Niesha's competence to testify was as follows:

BY THE COURT:
Q.    How are you, young lady?
A.    Good.
Q.    Why don't you tell me your whole name?
A.    Niesha Michelle Whitehead.
Q.    How old are you Niesha?
A.    Nine.
Q.    Do you know your birthday?
A.    Yes.
Q.    What's the date of your birthday?
A.    September 30th, September 30th.
Q.    Do you know what year?
A.    1993.
Q.    Are you in school?
A.    Yes.
Q.    Where are you in school?
A.    R.S. Payne.
Q.    R.S. Payne.  Speak into that microphone.
MR. PETTY:   Use your outdoor voice, Niesha.
BY THE COURT:
Q.    Just talk into the mic.
      Are you a little bit nervous?
A.    (Witness nods head up and down.)
Q.    That's a yes?
A.    Yes.
Q.    All right.  I don't blame you.  I'd be nervous, too,
      if I was sitting in that chair.
      Do you know who – I'm Judge Perrow.
      Do you know what a judge does in a courtroom?
A.    No.
Q.    You don't?
      I just preside over the trial, okay?
A.    Okay.
Q.    Do you know why we're here today?
A.    (No response).
Q.    Do you know why you're here today?
A.    (No response).
Q.    Do you want to think about that for a while?
A.    Yeah.

16

Q. Okay. There's no right or wrong answers, just do you know – you just raised your hand and told this lady, who's the clerk, that you would tell the truth. Do you know what it means to tell the truth?
A. Yes.
Q. What does it mean?
A. Just the truth.
Q. All right. You mean –
A. Just the truth.
Q. Well, do you know what the truth means?
A. (No response).
Q. Can you give me an example?
A. (No response).
Q. Can't think of an example?
A. No.
Q. Do you know what it means to lie?
A. Yes.
Q. What does it mean to lie?
A. Not telling the truth.
Q. Not telling the truth.
   Does anything happen to you if you don't tell the truth? Is that good or bad?
A. Bad.
Q. And why is it bad?
A. Because you'd be telling a lie.
Q. You'd be telling a lie.
   You could maybe hurt somebody if you told a lie; is that right?
A. Yes.
Q. What grade are you in?
A. Fourth.
Q. Fourth grade.
   What do you – what subjects do you study in school?
A. Science.
Q. Science?
A. (Witness nods head up and down.)
Q. Do you like science?
A. Yes.
Q. And what else do you study?
A. Math.
Q. Math.
   Do you like math?
A. Yes.
Q. What kind of grades do you get in school, Niesha?
A. Bs and Cs.
Q. Bs?
A. And Cs.

17

Q.    Do you get all Bs or some Cs or –
A.    Some Cs.
Q.    Some Cs, all right.
      And do you know who these gentlemen are seated down here at this table?
      These are lawyers.  They're going to ask you some questions.
      Do you think you can answer their questions?
A.    Yes.
Q.    Are you going to answer them truthfully?
A.    Yes.
Q.    All right.  And do you know who this lady is right here?
A.   (Witness shakes head side to side.)
Q.    She's –
A.    No.
Q.    – the court reporter. She takes down everything we say so there will be a record of what we say.
A.    Okay.
Q.    And that lady right there, she's one of the bailiffs. She helps run the courtroom.
      Do you think you can sit here and answer the questions?
A.    Yes.
Q.    And are you going to tell the truth?
A.    Yes.
Q.    If you don't know an answer, what are you going to say?  Do you feel like you have to answer every question?
A.    No.
Q.    Only the questions you know the answer to?
A.    Yes.
Q.    Are you going to make up any answers?
A.    No.
Q.    If you don't know the answer to a question, you're going to tell us you don't know?
A.    Yes.
Q.    Do you understand there's nothing wrong with that? We just want to know what you know, if anything, and we want the truth.  Do you think you can do that?
A.    Yes.
Q.    All right.  And do you know why we're here, what this is all about, what this is called?
A.    (No response).
Q.    Can't think of what it's called?
A.    No.

18

```
Q.   Well, do you know why you're here today, Niesha?
     Were you present when your mother was killed?
A.   Yes
Q.   You were in the house – were you in the house?
A.   Yes.
Q.   Are you going to tell us whether or not you saw
     anything?
A.   Yes, yes.
Q.   Are you going to tell us the truth?
A.   Yes.
```

The trial court concluded that Niesha was competent to testify and observed, "I think she's scared to death." Winston argues that the trial court erred in interpreting "the child's inability/refusal to answer as shyness when an equally valid explanation was her not understanding the questions or oath." However, our review of the transcript does not reveal "manifest error" in the trial court's determination that the child was shy or nervous about testifying. Niesha was able to discuss the difference between lying and telling the truth and understood that lying was "bad." She also appeared to understand that it was acceptable to admit to the court that she did not know the answer to a question. Considering the voir dire in its totality, she appeared to understand the court's questions and was able to answer them. Additionally, at a pretrial hearing, the trial court heard testimony from a licensed professional counselor who had been providing counseling to Niesha. The counselor testified that Niesha was anxious about coming to the courtroom and was concerned that

19

the man who killed her mother might hurt her if she appeared in the courtroom.

Winston does not assign error to the trial court's determination that Niesha was competent to testify. Rather, Winston complains that an expert was not appointed to examine Niesha to aid in the determination of her competence to testify. He alleges that the voir dire examination reveals the need to have appointed an expert to examine Niesha. Upon review of the record, we find no error in the trial court's decision not to appoint an expert for this purpose.

Winston's third argument regarding the appointment of experts concerns his request for a qualified mental health expert to investigate issues for sentencing. Winston requested appointment of an expert under Ake v. Oklahoma, 470 U.S. 68 (1985) and Husske. Winston eschewed any request pursuant to Code § 19.2-264.3:1, which addresses such assistance to an indigent capital murder defendant. Presumably, Winston sought to avoid the notice and access requirements of the statute in the event that reports developed pursuant to the provisions of the statute were offered by the defendant in mitigation at a sentencing proceeding. The trial court nonetheless granted the expert assistance requested by Winston pursuant to Code § 19.2-264.3:1. Winston complains that he has a right under Ake and

Husske to the appointment of a mental health expert independent of the provisions of Code § 19.2-264.3:1.

The Supreme Court in Ake held that an indigent defendant charged with a capital offense is entitled to a mental health expert at state expense when, 1) sanity at the time of the offense is an issue, and 2) future dangerousness is an aggravating factor in the sentencing proceeding and the state offers psychiatric testimony in support of future dangerousness. Ake, 470 U.S. at 83, 86-87. In Husske, we held

> that an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is "likely to be a significant factor in his defense," Ake, 470 U.S. at 82-83, and that he will be prejudiced by the lack of expert assistance. Id. at 83. An indigent defendant may satisfy this burden by demonstrating that the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial. See State v. Mills, 420 S.E.2d [114,] 117 [(N.C. 1992)]. The indigent defendant who seeks the appointment of an expert must show a particularized need.

252 Va. at 211-12, 476 S.E.2d at 925.

The General Assembly provided in Code § 19.2-264.3:1 a comprehensive statute concerning the provision of health care experts when a defendant's mental condition is relevant in a capital sentencing. Winston never suggested that his sanity at the time of the offense was an issue. He requested a mental

21

health expert solely for the purpose of sentencing. The Commonwealth did not present psychiatric evidence of Winston's future dangerousness as was the case in Ake. Nonetheless, in this case, Winston received precisely what he requested, only he received it pursuant to the statutory provisions. Assuming that Ake required such assistance in this case, Winston clearly received it when the trial court provided a mental health expert to assist him pursuant to Code § 19.2-264.3:1. Significantly, Winston gave no notice of presentation of psychiatric evidence and proffered no such evidence at the sentencing; consequently, no objection to the provision of a specific report to the Commonwealth under subsection D of the statute is at issue in this case. The trial court did not err in its provision of a qualified mental health expert pursuant to Code § 19.2-264.3:1.

## 2. Seating of Jurors

Winston assigns error to a number of rulings of the trial court related to voir dire of the jury panel and the seating and removal of individual jurors. Winston claims that the trial court "erred in limiting voir dire of the venire by the defense" and "erred in describing the punishment to the venire." (A.E. 20 and 21). His arguments on these topics relate to the trial court's refusal to allow Winston's counsel to question the jury about the impact of parole ineligibility

22

and the trial court's description of the possible punishments in capital cases as "death" or "life in prison," rather than life in prison without the possibility of parole. He argues that parole ineligibility may affect the jurors' view on the death penalty and that in the absence of guidance from the trial court on the topic of parole ineligibility, the members of the venire lack the "information needed to respond completely and truthfully to questions propounded to him/her." He also suggests that anyone with misconceptions about parole ineligibility should be removed from the venire.

In Lilly, 255 Va. at 567, 499 S.E.2d at 529-30, we rejected the idea that "knowledge of parole ineligibility rules and exploration of potential jurors' opinions on that subject would be a proper topic for voir dire." Instead, we noted that the "probable confusion and prejudice such an inquiry would cause in the minds of jurors is self-evident." Id. We echoed that reasoning in Hills, 262 Va. at 811-12, 553 S.E.2d at 724-25, where we held that the proper time to inform the jury about parole ineligibility is when the court instructs the jury in the penalty phase. In Fishback v. Commonwealth, 260 Va. 104, 115, 532 S.E.2d 629, 634 (2000), we established a rule requiring juries to be instructed on the abolition of parole for non-capital felony offenses committed on or after January 1, 1995.

This jury was properly instructed concerning parole ineligibility at the time of its deliberations. It was not error to refuse voir dire on this subject at the time of jury selection.

Additionally, Winston assigns error to the trial court's voir dire. (A.E. 24). Specifically, Winston objects to the trial court's following statements and questions:

> Ladies and gentlemen, I want — also want you to understand that in every criminal case the defendant has the opportunity but no obligation to put on evidence. And that is because in our system should the state accuse any of us of a crime, we don't have to prove our innocence, the state has to prove our guilt beyond a reasonable doubt.
> So do you understand that the defendant has an opportunity but no obligation to put on evidence? Do each of you understand that?
> THE JURY POOL: (Nod heads up and down.)
> THE COURT: Does anyone hold it against the defendant should he elect not to put on evidence?
> THE JURY POOL: (Shake heads side to side.)

Winston mischaracterizes the trial court's question as "suggest[ing] Leon Winston would put on evidence in defense of the charges," by pulling a single phrase out of context. A fair reading of the trial court's colloquy shows that the trial court's statements and questions confirmed that none of the jurors would draw an unfair inference from the defendant's choice not to present evidence.

Furthermore, Winston did not object to the trial court's voir dire on this subject. The trial court had previously advised Winston's counsel that the court's voir dire would contain this information. There was no objection on the occasion of the trial court's advice to counsel nor upon the actual voir dire of the jury. In fact, Winston's own proposed voir dire questions advised the jury that the defendant did not have to testify or produce evidence. Winston mischaracterizes the trial court's voir dire. In any case, he failed to object and may not be heard to complain for the first time on appeal. Rule 5:25.

Winston assigns error to the trial court's removal of certain jurors from the venire. (A.E. 22). Winston argues that he is entitled to be tried by a jury of his peers and such a jury must include jurors who oppose imposition of the death penalty. Winston argues that to constitute a true "cross-section" of the community, his jury should have been composed of people who support the death penalty, people who oppose the death penalty, and people who "are ambivalent towards it." With regard to jurors Margaret Gaines, Harold Donovan, Jeremy Collins, Melinda Wheeler, and Albert Delbridge, Winston argues that these jurors were struck from the panel because they opposed the death penalty under any circumstances. He asserts that Winston was thereby denied a jury of his peers under the

Sixth Amendment to the Constitution of the United States and Article I, § 8 of the Constitution of Virginia. He further maintains that striking these jurors from the venire "denied these jurors equal protection under the law" under the rule announced in Batson v. Kentucky, 476 U.S. 79 (1986).

The Supreme Court of the United States has rejected the "cross-section" argument made by Winston. In Lockhart v. McCree, 476 U.S. 162 (1986), the Supreme Court held that " 'death qualification' does not violate the fair-cross-section requirement" of the Constitution of the United States. Id. at 176-77. In Spencer, 238 Va. at 282, 384 S.E.2d at 778, citing Lockhart, we rejected the "cross-section" argument based on both the Federal and the Virginia Constitutions. We find no reason to modify our previous holding.

Winston also assigns error to the trial court's refusal to strike jurors Janet Capps, Michael Lewis, Anastasia Kreff, and Paulene Todd for cause. (A.E. 23). However, he offers only two sentences in his brief to support this assignment of error, one of which is an unhelpful quote of a single sentence of one of our prior opinions. This is not an argument in support of this assignment of error. Consequently, this assignment of error is waived due to Winston's failure to adequately brief the issue. Rules 5:27, 5:17(c).

Winston's remaining argument relating to the seating of the jury, assignment of error 25, is barred under Rule 5:25. Winston did not object to the trial court's decision to seat jurors Robbie Johnson and Shirley Childress.

Winston's final challenge to the composition of his jury is expressed in his assignment of error asserting that the trial court erred in "failing to declare a mistrial and failing to set aside the jury verdict upon learning of third party communications with members of the jury." (A.E. 32). During the trial, it was brought to the trial court's attention that jurors had been approached during various recesses by a woman who made comments about the case. It would serve no purpose to recite the substance of the comments because the trial court, with the agreement of counsel, examined the four jurors who had heard such remarks. Neither the Commonwealth nor Winston requested that any other jurors be examined on the subject. After discussing the matter with Winston, counsel for Winston was asked by the trial court, "Do you have any motion?" Defense counsel responded, "Judge, we do not have a motion. We have discussed it with our client, and we have no motion and will go forward with the trial." The frivolous nature of this assignment of error should be apparent to counsel. It is barred by Rule 5:25.

D. Guilt Phase

27

## 1. Evidentiary Issues

### a. Hearsay

Winston asserts that the trial court improperly overruled his hearsay objection during the testimony of Investigator David Gearhardt ("Gearhardt"). (A.E. 31). The Commonwealth asked Gearhardt whether Niesha had said that one of the two men in her house had a tattoo. The Commonwealth argues that the question objected to "merely introduced the fact that Gearhardt photographed the tattoo on Winston's arm." The transcript of Gearhardt's testimony is as follows:

```
BY MR. PETTY:
     Q.   Now, did you become aware that Niesha
          Whitehead had mentioned seeing a tattoo on
          one of the individual's arms who was
          involved in this?
     A.   Yes.

MR. DREWRY: Objection, Judge.  It's hearsay.
MR. PETTY:  Your Honor, it's offered only to show —
THE COURT:  Overruled.
MR. PETTY:  — what he did after that. Thank you.

BY MR. PETTY:
     Q.   Answer that question.
     A.   Yes, I did.
     Q.   And as a result of that, did you go take a
          photograph of a tattoo on the arm of this
          defendant?
     A.   Yes, I did.
```

The phrasing of the Commonwealth's question, "did you become aware," suggests that the subject of the question was Gearhardt's awareness of the statement made by Niesha, not the

28

truth of the content of the statement.  That Gearhardt's answer was followed by a question concerning the effect of his awareness of the statement on his actions — he took a photograph of Winston's arm — further supports the Commonwealth's statement of the purpose for the question.

In Weeks v. Commonwealth, 248 Va. 460, 477, 450 S.E.2d 379, 390 (1994), cert. denied, 516 U.S. 829 (1995), we held that "[t]he hearsay rule does not operate to exclude evidence of a statement offered for the mere purpose of explaining the conduct of the person to whom it was made."  We have held more generally:

> The hearsay rule excludes out-of-court declarations only when they are "offered for a special purpose, namely, as assertions to evidence the truth of the matter asserted."  If the court can determine, from the context and from the other evidence in the case that the evidence is offered for a different purpose, the hearsay rule is no barrier to its admission.

Manetta v. Commonwealth, 231 Va. 123, 127, 340 S.E.2d 828, 830 (1986) (citations omitted).  The trial court did not err in overruling the hearsay objection asserted by Winston.

### b.  Identification Testimony

Prior to trial, Winston filed three motions concerning the in-court identification of Winston by three different witnesses:  Michelle Lipford ("Lipford"); Niesha Whitehead ("Niesha"); and David Hardy ("Hardy").  In each motion, he

29

alleged that the witness' in-court identification "will be based upon suggestive pre-trial identification procedures rendering it substantially likely he will misidentify Leon Jermain Winston as a participant in the charged offenses." After the resolution of these three motions, Winston filed a fourth motion, later amended, seeking to prevent in-court identification of Winston's tattoo by Niesha.

A pretrial hearing was held concerning the first three motions. At that hearing, Winston's counsel argued that the Commonwealth should bear the burden of showing that the out-of-court identification was not suggestive in a manner that might corrupt the in-court identification. The Commonwealth argued that the burden should be on Winston to show that the process used for out-of-court identification was unduly suggestive. The trial court ruled that the burden was on the defense and noted Winston's objection.

Winston called three police officers as witnesses and his questioning focused on whether Niesha had been shown photographs of a coat and matters relating to Winston's tattoos. At the conclusion of the testimony, Winston's counsel withdrew the motion concerning Hardy. Furthermore, with respect to the motion concerning Michelle Lipford, he stated that it "fails [sic] for the defendant to put on any evidence." The Commonwealth informed the trial court that they were not

going to ask Niesha any questions about the coat in the photograph, that the coat was not in evidence, and that the coat was "not a part of this case."  The trial court recognized the withdrawal of the motion concerning Hardy, denied the motion concerning Lipford, and denied the motion concerning Niesha on two grounds – that the coat would not be part of the evidence at trial and that Winston had failed to carry his burden of proof.

The parties discussed the fourth motion at a hearing on March 17, 2003.  At that time, Winston noted that one of the Commonwealth's attorneys, William G. Petty ("Petty"), and Niesha might be required as witnesses on the motion.  The trial court ordered the Commonwealth to "provide an affidavit from Mr. Petty for the record with a copy to defense counsel with regard to the presentation of the tattoo to [Niesha as to] his recollection of [what occurred]" on the two occasions where a picture of the tattoo had been presented to her.  He also ordered both parties to submit briefs or case law to the court within 10 days.  Petty's affidavit was submitted to the trial court on March 24, 2003.  The Commonwealth also submitted a letter brief and two cases in support of its position that identification of a tattoo should be treated more leniently than the identification of a person.  The issue arose at a May 23, 2003 hearing.  The trial court ruled that the picture of

31

Winston's tattoo could not be shown to Niesha at trial for identification nor could her out-of-court identification of the tattoo be used as evidence. The trial court then ruled on the remainder of Winston's motion to suppress Niesha's testimony about the tattoo. The trial court ruled that Niesha would be permitted to testify as to her own recollection of the tattoo and that the officer who took the picture of Winston's tattoo could "show the tattoo to the jury."

Two of Winston's assignments of error pertain to the trial court's disposition of Winston's motions to suppress identification. Assignment of error 12 asserts that the trial court "erred in placing the burden of proof upon [Winston] in a motion to suppress identification testimony." Assignment of error 19 asserts that the trial court "erred in failing to exclude Michelle Lipford's identification of [Winston]."

Winston's assignment of error 12 is without merit. In Neil v. Biggers, 409 U.S. 188 (1972), the Supreme Court established a two part analysis for determining whether an in-court identification should be excluded because of the State's use of an improper method for obtaining an out-of-court identification. First, it must be shown that the circumstances of the out-of-court identification were unnecessarily suggestive. Id. at 198-99. The second part of the analysis is the determination of "whether under the 'totality of the

32

circumstances' the identification was reliable even though the confrontation procedure was suggestive." Id. at 199. The Supreme Court provided no specific allocation of the burden of proof on either part of the analysis. See, e.g., Manson v. Brathwaite, 432 U.S. 98, 106-14 (1977).

The United States Court of Appeals for the Fourth Circuit applied Biggers in United States v. Wilkerson, 84 F.3d 692 (4th Cir. 1996), cert. denied, 522 U.S. 934 (1997). In that case, the court stated that "the defendant must establish that the photographic lineup procedure was impermissibly suggestive." Id. at 695 (emphasis added). We adopt this allocation of the burden of proof. The trial court did not err by placing the burden of proof upon Winston in the pretrial motion to exclude identification testimony at trial. With regard to the fourth motion relating to Niesha's testimony about the tattoo, Winston makes no particular argument in his brief and this claim of error is therefore waived. Rule 5:17(c).

Winston's assignment of error 19 is barred by Rule 5:25. At trial, Winston conceded that "the motion concerning Michelle Lipford fails [sic] for the defendant to put on any evidence."

c. Evidence concerning Rhonda Robinson's pregnancy

The issue of Rhonda's pregnancy was first raised at a pre-trial hearing when Winston moved the trial court "to prohibit the Commonwealth from mentioning anything concerning . . . her

pregnancy in the opening statement, voir dire or during its case in chief." Winston argued that "the death, the violent death, of a pregnant woman is inflammatory" and that the fact of Rhonda Robinson's pregnancy had no relevance to the case. The trial court sustained "the motion with respect to voir dire and opening statements" and "reserv[ed] ruling on the admissibility of that fact at trial."

Just before Nathan Rorls was called as a witness in the guilt phase of the trial, and out of the presence of the jury, the parties again argued the admissibility of testimony about Rhonda's pregnancy. The Commonwealth, requesting permission to ask Rorls about Rhonda's pregnancy, argued, "It is our position that that information should come in as coming through the defendant as – and, again, from a credibility point of view, in that it's information that can be corroborated by independent information." Winston countered that such testimony would be "extremely inflammatory and prejudicial, and that its inflammatory and prejudicial nature far outweighs any probative value that it has." The trial court then entertained discussion of whether Rhonda's pregnancy would have been apparent upon viewing her. After examining photographs of Rhonda and determining that her pregnancy was not apparent, the trial court ruled:

        I'm going to allow it if the witness can
testify as to what the defendant told him about
the appearance.  That's what I'm going to do.
I'm going to allow it into evidence on direct.
You can cross examine him.
        Seems to me if it's not apparent, that it's
— that it might be effective cross-examination.

Winston noted his objection.

The Commonwealth did not elicit any evidence of Rhonda's pregnancy on direct examination of Rorls.  Only after Winston sought to impeach Rorls' credibility on cross-examination did the Commonwealth seek to rehabilitate Rorls on re-direct examination.  Only then was evidence of Rhonda's pregnancy elicited from the witness.  Rorls had separately testified on direct and cross-examination that all the information he had concerning the murders came from Winston, whom Rorls called "Tootie."  Then, the Commonwealth's Attorney engaged in the following exchange with Rorls on re-direct examination.

    BY MR. DOUCETTE:
        Q.  Do you remember any of the details that he
             gave you?
        A.  Tootie?
        Q.  Yeah.
        A.  Yeah.
        Q.  What?
        A.  That she was pregnant.
        Q.  She who, she was pregnant?
        A.  The girl.
        Q.  The girl?
        A.  Yeah.
        Q.  What girl?
        A.  The one that he shot, killed.
        Q.  She was pregnant?
        A.  Yeah.
        Q.  Did you know she was pregnant?

35

```
A.   No.
Q.   How did you know she was pregnant?
A.   He told me.
Q.   Who told you?
A.   Tootie.
```

On recross-examination, Winston attempted to get Rorls to admit that he had received the information about Rhonda's pregnancy from Tywan Turner.  Rorls denied obtaining such information from Turner.  Winston was, however, able to establish that Rhonda's sister, Angela C. Whitehead ("Angela") knew Tywan Turner and it was clear from Rorls' direct examination and cross-examination testimony that he knew Tywan Turner.

The Commonwealth recalled Dr. Susan E. Venuti ("Dr. Venuti"), the medical examiner who performed the autopsy on Rhonda Robinson.  Winston objected to the Commonwealth's proposal to ask Dr. Venuti about Rhonda's pregnancy.  Winston argued that whether Dr. Venuti could substantiate the claim that Rhonda was pregnant was irrelevant.  The Commonwealth countered that it was offering Dr. Venuti's testimony to corroborate Rorls' testimony that Rhonda was pregnant.  The trial court ruled that Dr. Venuti's testimony on Rhonda's pregnancy was admissible because the subject matter was "already in."  Winston's objection was noted.  Dr. Venuti's testimony consisted of a single question and response:

```
Q.   Dr. Venuti, at the time of her death,
     was Rhonda Robinson pregnant?
A.   Yes, she was.
```

In its closing statement, the Commonwealth, in a series of statements showing how Rorls' testimony was corroborated by other sources, noted that "Nathan tells us [Rhonda] was pregnant. Dr. Venuti confirms that."

Three of Winston's assignments of error pertain to the testimony of Rorls and Dr. Venuti concerning Rhonda's pregnancy. First, Winston claims the trial court "erred when it allowed Nate Rorls to testify to the pregnancy of Rhonda Robinson." (A.E. 28). Second, he asserts the trial court "erred in allowing the prosecution to present prejudicial and irrelevant evidence concerning Rhonda Robinson's pregnancy." (A.E. 29). Third, he complains the trial court "erred by allowing the medical examiner to testify concerning Rhonda Robinson's pregnancy." (A.E. 33). These assignments of error can be reduced into a single argument that any mention of Rhonda's pregnancy at trial was irrelevant and, assuming that Rhonda's pregnancy has any relevance, its probative value was outweighed by its prejudicial effect on the jury. We must analyze Rorls' testimony and Dr. Venuti's testimony in the context in which they were offered to determine whether the trial court abused its discretion in admitting their testimony.

For a piece of evidence to be relevant, it must have a "logical tendency, however slight, to prove a fact at issue in

37

the case." Clay v. Commonwealth, 262 Va. 253, 257, 546 S.E.2d 728, 730 (2001); Goins v. Commonwealth, 251 Va. 442, 461, 470 S.E.2d 114, 127, cert. denied, 519 U.S. 887 (1996); Charles E. Friend, The Law of Evidence in Virginia § 11-1, at 431 (6th ed. 2003). According to the Commonwealth, the evidence of Rhonda's pregnancy, introduced by Rorls and Venuti, tended to prove that Rorls was a credible witness. In particular, the Commonwealth attempted to use the evidence of Rhonda's pregnancy to prove that Rorls received all of his information about the murder of Rhonda and Anthony from Winston, as opposed to Tywan Turner, investigators, or Commonwealth's Attorneys, among others.

The evidence was offered only on re-direct examination after Winston sought to impeach Rorls' credibility and suggesting that Rorls' knowledge of the murders did not come from Winston. If the evidence of her pregnancy was irrelevant before cross-examination, it certainly was relevant after cross-examination.

Having established that the evidence submitted by the Commonwealth concerning Rhonda's pregnancy was relevant and had a "logical tendency" to prove Rorls' credibility after attempted impeachment, we must consider whether the trial court nonetheless abused its discretion in the admission of this evidence because its probative value is outweighed by its prejudicial effect upon the jury. In Justus v. Commonwealth,

38

220 Va. 971, 979-80, 266 S.E.2d 87, 93 (1980), we held that it was proper to allow the Commonwealth to present evidence that the victim of a murder subsequent to rape was pregnant, where such evidence was one of several "pertinent factors to be considered by the jury in determining the amount of force that was used by the defendant to accomplish the rape, and the resistance that was offered by the victim, or that she was capable of offering." We are aware of sister states' opinions suggesting that evidence of a victim's pregnancy may inject unfair prejudice into a trial by evoking an emotional response in the jury, particularly in the guilt phase of a trial. See People v. Martinez, 734 P.2d 650, 652 (Colo. 1986); People v. Lewis, 651 N.E.2d 72, 84 (Ill. 1995); State v. Moore, 585 A.2d 864, 887 (N.J. 1991); Orona-Rangal v. State, 53 P.3d 1080, 1085 (Wyo. 2002). However, these courts have also recognized that evidence of pregnancy is not inadmissible per se; its prejudicial effect must be weighed against its probative value.

We note that the Commonwealth utilized the evidence for the stated purpose of its introduction, namely, to prove the credibility of Rorls after attempted impeachment by Winston. The Commonwealth did not sensationalize the evidence and made only one reference to it in closing arguments, using it to support the issue of Rorls' credibility. The evidence was clearly relevant for the purpose it was offered. Its

introduction was prompted by Winston's attack upon Rorls' credibility and the particularized attack suggesting that Rorls did not obtain information about the murders from Winston. Damaging evidence in the form of admissions by Winston was introduced through Rorls.  Rorls' credibility became an extremely important issue in the case.  Because Rhonda's pregnancy was not visibly apparent, the question of how Rorls would know became relevant to his credibility.  Under the circumstances of this case, we cannot say that the prejudicial impact of the testimony outweighed the probative value of the evidence.  The trial court did not abuse its discretion in admitting evidence of Rhonda's pregnancy.

d.  Testimony as to "public knowledge" by police officer

In his assignment of error 30, Winston claims the trial court "erred in allowing a police officer to testify as to what was and was not public knowledge."  Winston's claim is targeted at the testimony of Investigator Raymond D. Viar ("Viar").

Winston mischaracterizes Viar's testimony.  Following a series of questions concerning the investigation into Rhonda and Anthony's murder and Viar's interactions with Rorls during the course of the investigation, the Commonwealth asked Viar whether the facts he received from Rorls were "made public at that time in the course of this investigation."  Winston's attorneys objected, claiming that Viar "doesn't know what facts

40

are public and what are not."  The trial court permitted the Commonwealth to ask Viar whether, to his knowledge, the information had been made public.  The direct examination of Viar by the Commonwealth continued:

> Q.  Mr. Viar, what was your position in this investigation?
> A.  I was a supervisor at that time, the acting lieutenant for the crimes against persons investigations.
> Q.  And did you in that position have a supervision authority over everyone involved in the investigation?
> A.  Yes, I did.
> Q.  Were you familiar with all of the information that was gathered by the members of the investigating team?
> A.  Yes.
> Q.  Would you be in a position to be aware if any information had been released to the public?

> . . . .

> THE WITNESS:  I did the press releases.  I handled all the interviews for this particular case with the media.  I even wrote the written news releases that were used to give to the media people that showed up.

After further objection from Winston's counsel and discussion, the Commonwealth concluded its examination on this subject as follows:

> Q.  To the best of your knowledge, was any of the information that was provided to you — let me rephrase that.
> To the best of your knowledge, was — the information that Mr. Rorls provided you, that had not been released to the public?
> A.  Yes, to the best of my knowledge.

41

The clear import of this testimony is that the police had not released the evidence to the public.  While it might be a fair inference from Viar's testimony that the public at large did not know the information, Viar's testimony was simply that the police did not release the information to the public.  Viar testified only as to what he knew.  The foundation for his knowledge was properly established.  Winston simply mischaracterizes what occurred at trial.  The trial court did not err in admitting Viar's testimony on this subject.

### 2.  Jury instructions

### a.  Specific Intent

Winston makes three assignments of error relating to jury instructions 12 and 13, which were given to the jury at trial. Winston's assignment of error 40 states that the trial court "erred in giving jury instructions 12 and 13."  Assignment of error 51 states that the trial court "erred when it failed to instruct the jury that there must be the specific intent to rob Anthony Robinson to return a verdict of guilty for the attempted robbery of Anthony Robinson."  Assignment of error 52 states that the trial court "erred when it failed to instruct the jury that there must be the specific intent to rob Rhonda Robinson to return a verdict of guilty for the attempted robbery of Rhonda Robinson."

Instruction 12 stated as follows:

The defendant is charged with the crime of attempted robbery of Anthony Robinson. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
  (1)  That the defendant intended to commit robbery; and
  (2)  That the defendant did a direct act toward the commission of the robbery which amounted to the beginning of the actual commission of the robbery.

If you find from the evidence that the commonwealth [sic] has proved beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty but you shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.

If you find that the Commonwealth has failed to prove beyond a reasonable doubt either of the elements of the offense, then you shall find the defendant not guilty.

Instruction 13 was identical in language except it referred to attempted robbery of Rhonda.

In his argument on the issue, Winston claims that these instructions require the jury to find only general intent, not specific intent. Winston's argument is without merit. First, Winston confuses the issue by misusing the terms "general intent" and "specific intent." General intent is the intent to perform an act even though the actor may not desire the consequences that result. See Black's Law Dictionary 825 (8th ed. 2004). Specific intent is the intent to accomplish the

43

precise criminal act that one is later charged with.  See id. at 826.

The Commonwealth correctly argues that the instructions required it to prove for each victim that "the defendant intended to commit robbery and did a direct act toward the commission of the robbery."  By having a separate instruction for each victim, the instructions required the jury to find each element as to each victim.  Jury instructions 12 and 13 properly required the jury to find that Winston had the intent to rob both Rhonda and Anthony individually.  The trial court properly submitted these instructions to the jury.  Winston's assignments of error on this issue are without merit.

### b.  Malice

Winston makes the following three assignments of error:

38 The trial court erred in failing to instruct that the jury must find malice to return a verdict of guilty of capital murder and its jury instructions 1, 2, 3 were improper.

. . . .

48 The trial court erred when it failed to include the element of malice in the jury instruction and verdict form for the death of Rhonda Robinson.

. . . .

50 The trial court erred by not instructing the jury that it must find malice to return a verdict of guilty for the capital murder of Rhonda Robinson.

In his argument addressing these assignments of error, Winston argues that jury instruction 1 was improper because it did not require "the jury to find the killing was malicious." The first jury instruction states, in relevant part:

> The defendant is charged with the crime of capital murder. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> 1)  That the defendant killed Ronda [sic] Robinson; and
> 2)  That the killing was willful, deliberate, and premeditated; and
> 3)  That the killing was of more than one person as a part of the same act or transaction.

In Mackall, 236 Va. at 254, 372 S.E.2d at 768, we stated that "[m]alice is subsumed in proof of willfulness, deliberateness, and premeditation in the commission of a criminal offense" and that a separate instruction on malice is unnecessary when those terms are substituted. Winston argues that Mackall is distinguishable because "instruction #1 was predicated on a double homicide not on a felony murder theory" and Mackall allowed "the omission of malice as an element due to the felony-murder rule." We disagree. In Mackall, as in this instance, "the jury was instructed to determine whether the killing was willful, deliberate, and premeditated," not the associated felony. Id. at 254, 372 S.E.2d at 768 (emphasis

45

added).  Winston's assignments of error 38, 48, and 50 are without merit.

### c.  Concert of Action/Joint Participation

Winston asserts that the trial court "erred in instructing the jury on concert of action and [that] its jury instruction 24 was improper."  (A.E. 41).  Jury instruction 24 stated:

> If there is concert of action with the resulting crime of attempted robbery, burglary, shooting into an occupied dwelling or use of a firearm in the commission of a felony as one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing about those crimes are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

According to Winston, "[t]his instruction tends to indicate all who participate are guilty of the 'resulting crime,' reasonably interpreted by the jury to be 'capital murder' " because the instruction failed to explicitly state that it did not apply to the capital murder charge.  Winston unfairly construes the instruction.  By listing four specific crimes, the instruction makes clear that it applies only to those crimes.  To read this instruction otherwise would imply that any time a defendant is charged with and simultaneously tried for more than one crime, the instructions for each crime would have to list each of the other crimes to which it does not apply.  Such a requirement is unnecessary.  Furthermore,

46

the capital murder instruction specifically stated that principals in the second degree were excluded from responsibility for capital murder.

Winston also argues that instructions 26A and 26B improperly instructed the jury that a defendant may be found guilty of capital murder if the defendant participated in the acts leading to the victim's death. (A.E. 42). Jury instruction 26A stated:

> The Court instructs the jury that the evidence must establish beyond a reasonable doubt that the defendant was the person who killed Ronda [sic] Robinson before you can find him guilty of the capital murder of Ronda [sic] Robinson. One who is present, aiding and abetting the actual killing, but who does not perform the killing, is a principal in the second degree and may not be found guilty of capital murder.

> You may find the defendant guilty of capital murder if the evidence establishes that the defendant jointly participated in the fatal shooting, if it is established beyond a reasonable doubt that the defendant was an active and immediate participant in the act or acts that caused the victim's death.

Jury instruction 26B stated:

> The Court instructs the jury that the evidence must establish beyond a reasonable doubt that the defendant was the person who killed Anthony Robinson before you can find him guilty of the capital murder of Anthony Robinson. One who is present, aiding and abetting the actual killing, but who does not perform the killing, is a principal in the second degree and may not be found guilty of capital murder.

> You may find the defendant guilty of capital murder if the evidence establishes that the defendant jointly participated in the fatal shooting, if it is

47

established beyond a reasonable doubt that the defendant was an active and immediate participant in the act or acts that caused the victim's death.

Winston focuses on the second paragraphs of the instructions. He argues that each is improper for two reasons. First, he argues that the second paragraphs of the instructions were not supported by the evidence because "[t]here was no evidence [that] two persons participated in the death of Rhonda Robinson and no substantial evidence [that] Anthony Robinson was killed by the joint acts of two persons." Second, Winston argues that the language of each is misleading because it "does not require Leon Winston to be the triggerman." According to Winston, the second of two phrases beginning with "if" could allow the jury to find that participation in the robbery and burglary makes the defendant "an active and immediate participant in the act or acts that caused the victim's death." In other words, he alleges that the language of the second paragraphs of instructions 26A and 26B does not describe the role of a triggerman narrowly enough. Neither of these arguments has merit.

The Commonwealth cites Lenz v. Warden, 265 Va. 373, 381, 579 S.E.2d 194, 199 (2003), and Strickler, 241 Va. at 493-95, 404 S.E.2d at 234-35, in support of the instructions. In those cases, we approved language similar to that used in instructions 26A and 26B. In Lenz, the victim, a fellow inmate

in the state prison, suffered 68 stab wounds, all of which contributed to the victim's death.  Both Lenz and another inmate were accused of stabbing the victim with knives.  In approving an instruction which allowed the jury to convict Lenz of capital murder "if the Commonwealth proved 'beyond a reasonable doubt that [Lenz] was an active and immediate participant in the act or acts that caused the victim's death,'" we cited Strickler, holding that when "two or more persons take a direct part in inflicting fatal injuries, each joint participant is an 'immediate perpetrator' for the purposes of the capital murder statutes."  Lenz, 265 Va. at 381, 579 S.E.2d at 199 (citing Strickler, 241 Va. at 495, 404 S.E.2d at 235).

Additionally, Winston fails to consider the second paragraphs in context.  The first paragraph of each instruction makes it quite clear that one who "does not perform the killing" may not be guilty of capital murder.

In this case, Anthony was struck by eight bullets.  Two bullets recovered from Anthony's body were 9-millimeter bullets; one bullet was a .38 caliber bullet.  The two different weapons involved suggest two different gunmen were involved and Rorls' testimony supports this proposition.  The evidence establishes that Winston used the 9-millimeter

handgun.[2]  According to the medical examiner, all of Anthony's wounds were inflicted while he was alive and his death was caused by blood loss from the bullet wounds.  Because the evidence suggests that Winston was responsible for seven of the wounds contributing to Anthony's death, while one wound was attributable to another handgun, instruction 26A was proper.  Winston was one of two people who, by firing two different handguns, inflicted fatal injuries upon Anthony Robinson.

Rhonda was struck by three bullets.  The evidence suggests that all three were fired from a 9-millimeter handgun.  The Commonwealth argued that of the two men in the house, Winston used the 9-millimeter handgun.  Under the Commonwealth's theory, only one man was responsible for shooting Rhonda. There is no evidence that Winston used the .38 caliber handgun. There is ample evidence that he used the 9-millimeter handgun. The trial court did not err in giving instructions 24, 26A, and 26B to the jury.

d.  Triggerman/Lesser Included Offenses

Winston, in three assignments of error, maintains that he was entitled to jury instructions on first and second degree murder and accessory after the fact status with regard to the death of Rhonda Robinson and that the verdict forms given to

---

[2] The evidence connecting Winston to the 9-millimeter handgun includes DNA evidence and the testimony of Robin Wilson.

the jury should also have provided for these lesser included offenses. (A.E. 45, 47, and 49). Winston argues that there was "more than a scintilla of evidence" to support conviction on one of the lesser included offenses and that it was reversible error for the trial court to refuse to offer the instructions requested by Winston. Winston points to Niesha's testimony as evidence supporting conviction on a lesser included offense. He notes that parts of Niesha's testimony on cross-examination might suggest that Winston was not the triggerman. He notes that, on cross-examination, Niesha testified that the man dressed in all black, "Mr. No Name," shot her mother as she watched but that Tranika Turner, Winston's girlfriend, testified that when she picked Winston up, shortly after the killings, he was wearing a black sweatshirt with gray stripes.

The Commonwealth argues that, despite "Niesha's confusion on cross-examination in response to leading questions," the evidence overwhelmingly points to Winston as the triggerman. The Commonwealth highlights Rorls' testimony that Winston admitted shooting Rhonda to avoid leaving a witness, the fact that only 9-millimeter casings and bullets were found in the vicinity of Rhonda's body, and the numerous pieces of evidence,

including the testimony of Robin Wilson[3] and DNA evidence, proving that the 9-millimeter handgun used in the crime was Winston's.  Additionally, Niesha identified the man with the tattoo as being the one who shot her mother.  Significantly, Winston concedes on brief that "Winston cannot, and does not, deny that he was present when Anthony and Rhonda Robinson died."  Winston was the only criminal actor with a tattoo on his arm.

In light of the overwhelming evidence indicating that Winston was the triggerman responsible for Rhonda's death, we cannot say that a short passage excerpted from Niesha's testimony was sufficient to merit jury instructions on first or second degree murder, or accessory after the fact.  We have repeatedly held that jury instructions on lesser included offenses are proper only when there is sufficient evidence to support them.  See, e.g., Remington v. Commonwealth, 262 Va. 333, 351-52, 551 S.E.2d 620, 631-32 (2001), cert. denied, 535 U.S. 1062 (2002); Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998); Justus v. Commonwealth, 222 Va. 667, 678, 283 S.E.2d 905, 911 (1981), cert. denied, 455 U.S. 983 (1982) ("the evidence must amount to more than a scintilla").  In this

---

[3] Wilson testified that Winston brought the 9-millimeter handgun to Wilson's house shortly after the crime and that Wilson had held the handgun in his home until the police seized it following a search of his home.

case, there is not more than a scintilla of evidence supporting a conclusion that Winston was guilty of first or second-degree murder or of being an accessory after the fact in the death of Rhonda.  The trial court did not err in refusing to give instructions on lesser included offenses as tendered by Winston concerning the murder of Rhonda.

   e.   Proper Verdict Form for the Murder of Anthony Robinson

   In his assignment of error 46, Winston argues "the trial court erred in failing to include all possible verdicts for the death of Anthony Robinson on the same verdict form."  Winston does not suggest what possible verdict was omitted.  The verdict form in question provides for verdicts of guilty of capital murder, or first degree murder, or second degree murder, or not guilty.  Winston's assignment of error on this point is waived for failure to make sufficient argument.  Rule 5:17.

   f.   Order of Firearm Offenses

   Winston makes a single argument for assignments of error 56 and 62.[4]  He argues that although he "was indicted for five

---

[4] In assignment of error 56, Winston claims, "The trial court erred by giving jury instructions 50, 53, 64, 65, 66, and 67." Of the jury instructions listed in Winston's assignment of error 56, instructions 50 and 53 make no mention of the use of firearms.  We will not consider them here.  In assignment of error 62, Winston refers to jury instructions 97-100.  These numbers do not correspond to jury instructions.  Rather, they

counts of use of a firearm in the commission of a felony . . . [n]one was charged as a second [or] subsequent offense."  He contends that because Code § 18.2-53.1 establishes an enhanced sentence for "a second or subsequent conviction" under the statute, it was necessary for the jury to determine the chronological order of the offenses.  He also contends that the jury verdict forms should have included some indication of the sequence of the convictions.  According to Winston, without an allegation, proof, and a decision concerning the order of the offenses, "there can be no second conviction."  He also asserts that to administer an enhanced punishment without determining the order of the offenses violates his due process rights under the Fifth and Fourteenth Amendments, his "right to be informed of the charge against him," and the requirement that the trier of fact must find, beyond a reasonable doubt, that he is a second offender.

We disagree.  In Flythe v. Commonwealth, 221 Va. 832, 834-35, 275 S.E.2d 582, 583-84 (1981) (citing Ansell v. Commonwealth, 219 Va. 759, 763, 250 S.E.2d 760, 763 (1979)), we held that a defendant could be convicted and sentenced for more than one charge under Code § 18.2-53.1 even though the charges arose from a single incident.  We held, "It is the identity of

---

are the numbers at the top of the jury verdict forms relating to the firearm charges.

54

the offense and not of the act which is dispositive" because "if two or more persons are injured by a single criminal act, this results in a corresponding number of distinct offenses." Id. If chronology were all important, as Winston claims, Code § 18.2-53.1 would be unenforceable where offenses occurred simultaneously from a single act or where a defendant was first prosecuted for an offense that occurred after another offense. Such a result would unnecessarily impede the statute's goal of deterring violent crimes. See In re Commonwealth, 229 Va. 159, 162, 326 S.E.2d 695, 697 (1985); Ansell, 219 Va. at 763, 250 S.E.2d at 762-63. Neither the purpose nor the effect of the statute impacts Winston's constitutional rights. The trial court did not err in granting these instructions.

3. Sufficiency of the Evidence – Capital Murder

In his assignment of error 37, Winston states:

> The trial court erred in not striking the capital murder charges in the face of the prosecution's failure to allege in the indictment essential elements, to prove these essential elements of the crime, and to require the jury to find beyond a reasonable doubt each element was established, namely that defendant was over the age of 16, that he was the triggerman, and that he was not mentally retarded.

He then argues that the Commonwealth was required to prove six elements:

1) Leon Winston killed Anthony Robinson; and

55

2) The killing was malicious, willful, deliberate and premeditated; and

3) The killing occurred during the commission of attempted robbery; and

4) Leon Winston was the triggerman; and

5) Leon Winston was over the age of 16; and

6) Leon Winston was not mentally retarded.

Winston claims that the Commonwealth's evidence was conflicting concerning whether he was the triggerman and that the Commonwealth failed to prove that he was over the age of 16 and not mentally retarded.

Winston urges us to comb through the record to find other arguments he may have made to the trial court throughout the pre-trial and trial process.  We will address only those arguments presented in Winston's brief. Rules 5:17, 5:27.  Winston has waived the portion of assignment of error 37 regarding the sufficiency of the indictment.  We reserve our discussion of the issue of mental retardation for a subsequent portion of this opinion.  Here, we address only Winston's contentions that the evidence was insufficient to prove that Winston was the triggerman and that Winston was over the age of 16.

The Commonwealth proved beyond a reasonable doubt that Winston was the triggerman in the murders of Anthony

and Rhonda Robinson.  We have described the evidence proving that Winston was the triggerman in our discussion of whether Winston should have received jury instructions for lesser included offenses.  It is unnecessary to repeat it here.

Winston's argument that the Commonwealth failed to prove that he was over the age of 16 is without merit. The statutory definition of capital murder, Code § 18.2-31, does not require proof that the defendant is over the age of 16.  Therefore, the defendant's age is not an element of the crime.[5]  In Thompson v. Oklahoma, 487 U.S. 815, 838 (1988), the Supreme Court held that a person may not be executed for a crime committed before the age of 16. However, Thompson is no bar to conviction of a capital offense.  Therefore, the defendant's age is properly raised at sentencing, not during the guilt phase of the trial.  At sentencing, Winston's mother testified that Winston was born on July 2, 1980.  He was 21 on April 19, 2002, when the offenses were committed.  For these

---

[5] The exception to this general rule is Code § 18.2-31(12) which defines one form of capital murder as "[t]he willful, deliberate, and premeditated killing of a person under the age of fourteen by a person age twenty-one or older."  That provision is not at issue in this case, but illustrates that if the General Assembly had wished to make the defendant's age an element of the crime of capital murder, it could have done so in the language of the statute.

reasons, Winston's assignment of error 37 is without merit.

    4.  Sufficiency of the Evidence - Attempted Robbery

    Winston argues assignments of error 34, 36, 53, and 54 together.  Those assignments of error are as follows:

    34   The trial court erred by not striking the
         evidence at the close of the prosecution's case.

                        . . . .

    36   The trial court erred in ruling the evidence was
         sufficient to support jury instructions
         regarding attempted robbery in the course of
         capital murder in the absence of evidence
         establishing the corpus delicti of the crime.

                        . . . .

    53   The trial court erred by not setting aside the
         jury verdict.

                        . . . .

    54   The trial court erred by not setting aside the
         jury verdict when the prosecution failed to
         present evidence establishing the corpus delicti
         of attempted robbery.

Winston argues that the evidence was not sufficient to prove that Winston was the triggerman or to prove that Winston intended to rob Anthony and Rhonda.  Having already addressed the sufficiency of the evidence proving that Winston was the triggerman, we focus our discussion of these assignments of error on the sufficiency of the evidence for Winston's

58

conviction of attempted robbery and capital murder based upon a predicate of attempted robbery.

Winston argues that the evidence of attempted robbery is insufficient for four reasons: 1) the testimony of Rorls concerning Winston's intent is "unclear;" 2) Rorls' testimony "contradicts" the theory that Winston intended to rob Rhonda; 3) Rorls' testimony is "not credible;" and 4) the trial court found that the same evidence was insufficient to support a robbery charge.  In evaluating Winston's argument, we view the evidence in the light most favorable to the prevailing party below, the Commonwealth, and grant it the benefit of all fairly deducible inferences.  Elliott, 267 Va. at 400, 593 S.E.2d at 273; Lenz v. Commonwealth, 261 Va. 451, 455, 544 S.E.2d 299, 301, cert. denied, 534 U.S. 1003 (2001).

Winston's claim that Rorls' testimony is unclear is based on a single excerpt from his direct examination.  Winston argues that the following response from Rorls is unclear because Rorls uses the word "he" imprecisely:

> A.   He said that the dude that was with him,
> that helped him, you know, rob, took the dude
> downstairs or something, and he said, the dude
> shot him first.  And when the dude come running
> upstairs, he said he shot the dude in the upper
> body.  And then he said — he was like he don't
> want to leave no witnesses.  So the girl was
> screaming or something, and he said he shot her,
> too.

59

Winston ignores the fact that the Commonwealth's Attorney recognized at the time that Rorls' response was confusing and followed that response with a series of questions that clarified that Winston's "co-defendant" shot Anthony first, in the stomach, that Winston then shot Anthony "in the face or somewhere in the upper body," and that Winston then shot Rhonda.  Later, Rorls' testimony reveals why Winston went to the Robinson home:

> Q.   Did you — so he tells you this. What did you say?  What did you say to him?
> A.   I asked — I said — I said — asked him why he did that.  That's stupid, you know. He said he did that for no reason. I mean, you know, it don't make no sense to shoot them people.
> Q.   What did he say?
> A.   He was like he wanted to get paid.  He said somebody robbed him.
> Q.   I wasn't quite sure what you said. He said what, now?
> A.   Somebody robbed him a couple days before that, so he needed to make his money back up, he didn't get paid.

In this passage, "he" refers exclusively to Winston.  There is no mistaking the clear implication of this portion of Rorls' testimony:  Winston went to the Robinson home to rob the occupants.

Winston also appears to attach significance to the fact that Rorls did not state that Winston intended to rob Rhonda specifically.  Robbery is " 'the taking, with intent to steal, of the personal property of another, from his person or in his

presence, against his will, by violence or intimidation.' "

Pritchard v. Commonwealth, 225 Va. 559, 562, 303 S.E.2d 911,

912 (1983) (quoting Mason v. Commonwealth, 200 Va. 253, 254,

105 S.E.2d 149, 150 (1958)).  Rorls' testimony indicates that

Winston went to the Robinson home in order to "make his money

back up."  His intent was larcenous.  The evidence proves that

Winston engaged in acts of violence to achieve this end.

Further, the evidence proves that Winston admitted robbing both

Rhonda and Anthony.  Rorls testified that Winston told him that

"he killed two people and robbed them."  Finally, the evidence

proves that Winston admitted to Rorls that he took cash and

cocaine from the Robinsons.

Winston argues that Rorls' recollection that Winston told

him that Winston did not "want to leave no witnesses, so he

said he turned around and he shot that bitch," actually

contradicts the notion that Winston was attempting to rob

Rhonda.  Winston argues that the proof offered only shows he

intended to prevent Rhonda from becoming a witness.  While

Winston's intent in actually killing Rhonda may have been to

silence her, that does not necessarily negate his intent to rob

her as well.  As noted above, Winston admitted robbing both

Rhonda and Anthony.

Third, Winston assails Rorls' testimony as unbelievable.

He relies heavily on discrepancies between Rorls' testimony and

Niesha's testimony to argue that "there is no evidence to prove intent to rob Anthony Robinson." The same evidence of Winston's intent to rob Rhonda applies to the attempt to rob Anthony as well. It need not be repeated. Winston claims that "a fair reading of [Niesha's] testimony points to a struggle taking place and Mr. Robinson's subsequent shooting being designed to avoid witnesses." The evidence demonstrates that Niesha was never downstairs during the incident. As a result, Niesha could not testify to anything more than the fact that she heard gunshots downstairs and that she heard Anthony try to come upstairs before he was shot again. None of this testimony addresses Winston's intent concerning the robbery or attempted robbery of Anthony.

Winston once again points to Niesha's confusion concerning which of the men was the shooter. Further, he argues that all of Rorls' testimony should have been disregarded by the jury. We note the oft-recited principle that "[t]he trier of fact is the sole judge of the credibility of the witnesses, unless, as a matter of law, the testimony is inherently incredible." Walker v. Commonwealth, 258 Va. 54, 70-71, 515 S.E.2d 565, 575 (1999) (citations omitted), cert. denied, 528 U.S. 1125 (2000); see also City of Portsmouth v. Houseman, 109 Va. 554, 558, 65 S.E. 11, 13 (1909).

In this case, Rorls' testimony was not inherently incredible. Large portions of Rorls' testimony are corroborated by other evidence and other witnesses. For example, Rorls testified that Winston showed him the handgun he had used in the crime and that the gun appeared to be a "Glock" or a 9-millimeter automatic. Winston later gave a 9-millimeter handgun to Robin Wilson. This handgun bore Winston's DNA. Rorls was able to relate a sequence of events for the murders that corresponded to the locations of the victims' bodies in the house. His testimony that Kevin Brown shot Anthony in the stomach and that Winston shot Anthony in the head and upper torso corresponds with forensic evidence concerning bullets retrieved in and around Anthony's body. In fact, other than Niesha's confusion as to clothing of the man who was the shooter, Niesha's testimony and Rorls' testimony largely reinforce each other. In light of these factors, the jury was not unreasonable in determining that Rorls' testimony was credible and assigning considerable weight to it.

Winston argues that the trial court must have found one of two things "as a matter of law" in order to strike the robbery charge originally filed against Winston. He claims that "[e]ither, [the trial court] found Mr. Rorls was so unbelievable that his testimony could not support a conviction

63

for robbery or it found the prosecution failed to introduce sufficient evidence to corroborate his account."

At trial, Winston moved to strike the robbery charges at the close of all the evidence. He raised a number of other motions to strike charges and evidence at the same time. These motions were argued simultaneously. The argument on the motion to strike the robbery charges centered upon whether the Commonwealth had presented sufficient evidence to prove that Winston had actually taken any property from Anthony and Rhonda, and, if so, exactly how much had been taken. After a recess, during which the trial court considered the arguments, it "made a ruling that there was insufficient evidence to corroborate the robbery charge" but would allow jury deliberations to go forward on the attempted robbery charge. Whether the trial court was correct that there was insufficient evidence to corroborate the robbery charge is not an issue in this case; however, submitting the case to the jury on charges of attempted robbery was not error considering the evidence presented.

Finally, Winston argues that there was insufficient corroboration of the intent to rob to support convictions for attempted robbery and the capital murder counts based upon attempted robbery. We disagree. Winston's statements to Rorls were presented to the jury. This evidence amounts to a

64

confession to actual robbery, capital murder, and the related

firearm charges.  Only slight corroboration to prove the corpus

delicti is required.  Clozza v. Commonwealth, 228 Va. 124, 133,

321 S.E.2d 273, 279 (1984), cert. denied, 469 U.S. 1230 (1985).

As we recently stated in Powell v. Commonwealth, 267 Va. 107,

590 S.E.2d 537 (2004), cert. denied, ___ U.S. ___, ___ S.Ct.

___ (2004):

> Although the Commonwealth may not establish an
> essential element of a crime by the
> uncorroborated confession of the accused alone,
> " 'only slight corroborative evidence' " is
> necessary to show the veracity of the
> confession.  Williams v. Commonwealth, 234 Va.
> 168, 175, 360 S.E. 2d 361, 366 (1987) (quoting
> Clozza v. Commonwealth, 228 Va. 124, 133, 321
> S.E.2d 273, 279 (1984), cert. denied, 469 U.S.
> 1230 (1985)), cert. denied, 484 U.S. 1020
> (1988).  What is more, if "[t]his corroborating
> evidence is consistent with a reasonable
> inference" that the accused committed the crime
> to which he has confessed, the Commonwealth need
> not establish through direct evidence those
> elements of the crime that are proven by the
> confession.  See Jackson v. Commonwealth, 255
> Va. 625, 646, 499 S.E.2d 538, 551 (1998), cert.
> denied, 525 U.S. 1067 (1999).

Id. at 145, 590 S.E.2d at 560.

Rorls actually saw what Winston stated was one-half of the

fruits of the robbery, namely $1000 and an ounce of crack

cocaine.  The evidence shows that $2000 and two rocks of crack

cocaine were taken, however, they were divided evenly between

Winston and his cohort.  The circumstances of the crime scene,

the DNA evidence relating to the handgun, the attempt to hide

the handgun with a friend, and the testimony of Niesha all serve to corroborate Winston's confession and his intent to rob both Anthony and Rhonda.

### 5.    Double Jeopardy

Winston argues that the trial court "erred by allowing two verdicts of guilty of capital murder of Rhonda Robinson." (A.E. 55).  The jury found Winston guilty of the capital murder of Rhonda Robinson for "killing of more than one person as part of the same act or transaction."  The jury also found Winston guilty of the capital murder of Rhonda Robinson for murder "in the commission of attempted robbery."

In Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293 (1999), we considered whether the imposition of multiple death sentences violates the provision of the Fifth Amendment of the federal Constitution, which states that no person "shall . . . for the same offense . . . be twice put in jeopardy of life or limb."  As we observed,

> This constitutional provision guarantees protection against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.  Illinois v. Vitale, 447 U.S. 410, 415 (1980); North Carolina v. Pearce, 395 U.S. 711, 717 (1969); Blythe v. Commonwealth, 222 Va. 722, 725, 284 S.E.2d 796, 797 (1981).

Payne, 257 Va. at 227, 509 S.E.2d at 300.

66

Winston does not state his assignment of error in terms of multiple punishments for the same offense. Rather, he alleges error in the "two verdicts of guilty of capital murder." Of course, an accused can be found guilty of capital murder and not receive the death penalty under Virginia law. The case of Clagett v. Commonwealth, 252 Va. 79, 472 S.E.2d 263 (1996), cert. denied, 519 U.S. 1122 (1997), cited by Winston, involved "multiple punishment double jeopardy," and is inapposite to his assignment of error.

Furthermore, since Clagett, we have considered the question whether a defendant charged with capital murder can be convicted of more than one offense of capital murder of the same victim and whether a defendant can receive more than one death sentence for the killing of the same victim. In Payne, the defendant was convicted of two distinct statutory provisions of subsection 5 of Code § 18.2-31 involving the same victim. Because "each statutory provision required proof of a fact that the other did not," we held that Payne was properly convicted of two capital offenses in the killing of the same victim. Additionally, Payne was sentenced to two death sentences for the same victim. We observed, "[w]e think it is clear, as well as logical, that the General Assembly intended for each statutory offense to be punished separately 'as a Class 1 felony.' " 257 Va. at 228, 509 S.E.2d at 301. In

67

approving the two death sentences for the capital murder of one victim, we further held "the convictions and sentences do not violate the constitutional guarantee of protection against multiple punishments for the same offense." Id. at 229, 509 S.E.2d at 301. The trial court did not err "by allowing two verdicts of capital murder of Rhonda Robinson."

## E. Sentencing Phase

### 1. Mental Retardation

With respect to the issue of mental retardation, Winston makes two assignments of error regarding the sentencing phase before the jury. First, he asserts that the trial court "erred by failing to give jury instructions A1, B1, C1, and 50A." (A.E. 57). Second, he claims that the trial court erred when it applied Code § 19.2-264.3:1.1 to his "proceedings" and "failed to follow the ruling of Atkins v. Virginia." (A.E. 58).

Winston makes no argument in his brief concerning jury instructions A1, B1, or 50A. Consequently, his assignments of error on these issues are waived. Rule 5:17.

Instruction C1 was offered by Winston and was refused by the trial court. Instruction C1 purported to place the burden on the Commonwealth to prove that Winston was not mentally retarded. We will consider his claims relating to the refused

68

instruction and his claims regarding Code § 19.2-264.3:1.1 together.

In _Atkins v. Virginia_, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment prohibits the execution of mentally retarded persons. _Id._ at 321. In the context of capital crimes, the issue of retardation is not an element of the offense; rather, it is an affirmative defense to the imposition of the death penalty. Clearly, under the Virginia statutory scheme, an accused can be found guilty of a capital offense and not receive the death penalty. Because _Atkins_ only precludes the execution of a person who is mentally retarded, it is abundantly clear that the issue of mental retardation is not an element of a capital offense.

The Supreme Court in _Atkins_ did not define mental retardation, nor did it prescribe procedures for determining it. The Court expressly left "to the states the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." _Id._ at 317 (citation and quotation marks omitted).

In 2003, after Winton's offense occurred but before his trial, the General Assembly of Virginia passed legislation providing a legal definition of mental retardation and procedures to raise and determine the issue in a capital murder trial in Virginia. Code §§ 19.2-264.3:1.1 and 19.2-264.3:1.2.

69

These statutory changes were enacted as emergency legislation and became effective upon the signature of the Governor on May 1, 2003. Winston's trial began over a month later on June 9, 2003. Winston's only argument that these newly enacted statutes do not apply to him is that a new element of the offense of capital murder was added by their enactment. Winston argues that "such action can not be applied retroactively under the ex post facto, due process, and equal protection clauses of the U.S. and Virginia Constitutions."

The newly enacted statutes do not supply an additional element of the offense of capital murder in Virginia. Rather, the statutes provide, in response to the direction of the Supreme Court of the United States in Atkins, a definition and methodology to establish a constitutional bar to execution.

Additionally, Winston argues that proof of lack of mental retardation is an aggravating factor that must be proved by the Commonwealth and decided by a jury if demanded by the accused under Ring v. Arizona, 536 U.S. 584 (2002) and Apprendi v. New Jersey, 530 U.S. 466 (2000). However, Winston misapprehends the treatment of mental retardation required by Atkins. Proof of the lack of mental retardation is not an element of a capital offense in Virginia, nor is it an aggravating factor in sentencing. Rather, proof of mental retardation is a bar to

70

execution of a mentally retarded defendant and the burden of such proof is on the defendant.

Other states have addressed this issue. In State v. Williams, 831 So. 2d 835, 860 (La. 2002), the Louisiana Supreme Court stated:

> The Supreme Court would unquestionably look askance at a suggestion that in Atkins it had acted as a super legislature imposing on all of the states with capital punishment the requirement that they prove as an aggravating circumstance that the defendant has normal intelligence and adaptive function. Atkins explicitly addressed mental retardation as an exemption from capital punishment, not as a fact the absence of which operates "as the functional equivalent of an element of a greater offense."

The statutory provisions of Code §§ 19.2-264.3:1.1 and 19.2-264.3:1.2 do not add an element of the offense of capital murder in Virginia, nor do they establish an aggravating factor to be proven by the Commonwealth. Accordingly, the application of these statutes to Winston does not violate the proscription against ex post facto imposition of law against him. Nor do these laws violate the requirements articulated in Ring and Apprendi.

Winston's remaining claims concerning the subject of mental retardation are waived because he deliberately declined to raise a claim of mental retardation under the statutory provisions that apply to him and his trial. Rule 5:25. Accordingly, we will not consider his claim that the statutes

71

are unconstitutional because they require the defendant to prove mental retardation and define retardation as occurring before the age of 18. His claims predicated upon the Constitution of Virginia are similarly barred by Rule 5:25.

## 2. Cumulative Evidence

Winston alleges that, during the penalty phase, the trial court erred in allowing testimony concerning Winston's actions during an arrest for eluding a police officer "when [the trial court] had already admitted the conviction and sentencing order" for the same offense. (A.E. 63). He claims that the evidence was cumulative and that its "only purpose was to inflame the passions and prejudices of the jury."

The sentencing order admitted into evidence reveals that Winston was found guilty of eluding a police officer on April 12, 2002 and that he was sentenced to a year in jail, with six months suspended, with his driver's license suspended for six months. He was also given credit for time spent in confinement awaiting trial. The sentencing order provides no other details about the offense.

The Commonwealth called Officer Levi B. Renno ("Renno") to testify about his arrest of Winston on April 12th. Renno testified that he saw Winston's car "run a stop sign." He followed the vehicle a short distance then activated the emergency lights on his patrol car. Winston's response was to

"accelerate sharply." According to Renno, Winston's vehicle was actually airborne several times on a hilly residential street as Renno pursued him. Winston "ran another stop sign" and three red lights, eventually reaching a speed above 90 miles per hour. The chase covered three to four miles and Winston nearly collided with three other vehicles during the chase. Winston's vehicle eventually collided with a fence in a parking lot as he attempted to jump from his car. As a number of police officers approached the vehicle, Winston continued to try to escape, even attempting to climb over the passenger who was in the front seat of the car. Once Winston was taken into custody, the police found a loaded 9-millimeter handgun in the passenger's lap. The passenger during the chase, Richard A. Waterstraat ("Waterstraat"), testified that when Waterstraat first entered the car, Winston showed him the handgun as he told him that "he had to go take care of some business."

The additional testimony provided by the Commonwealth's witnesses tends to show that Winston has a general disregard for human life and has a history of violent or dangerous behavior which speaks to the probability of his future dangerousness. We have held: "Admissible evidence in the sentencing phase is not limited to the defendant's record of convictions. We have repeatedly approved the use of testimonial evidence relating to a defendant's commission of

other crimes of which he has been convicted." Watkins, 229 Va. at 487, 331 S.E.2d at 436; see also George v. Commonwealth, 242 Va. 264, 273, 411 S.E.2d 12, 18 (1991), cert. denied, 503 U.S. 973 (1992). "In determining his proclivity for violence, the jury may obtain from the mere record of previous convictions an inaccurate or incomplete impression of the defendant's temperament and disposition." Stamper v. Commonwealth, 220 Va. 260, 276, 257 S.E.2d 808, 819 (1979), cert. denied, 445 U.S. 972 (1980). The trial court did not err in admitting the testimony of Renno and Waterstraat.

### 3. Depravity of Mind/Aggravated Battery

In assignment of error 61, Winston argues that the trial court "erred in providing sentencing verdict forms allowing a finding of 'inhumane' [sic] action when the evidence for such a finding was lacking." Winston argues that the evidence was insufficient to support the giving of an instruction permitting the death penalty based upon "depravity of mind or aggravated battery."

The evidence in this case supports the trial court's instructions on "vileness." As we stated in Goins, "a finding of 'vileness' must be based on conduct which is 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim.' " 251 Va. at 468, 470 S.E.2d at 131 (quoting Code

74

§ 19.2-264.2).  The evidence indicates that Winston committed aggravated battery on both Anthony and Rhonda Robinson within the meaning of Code § 19.2-264.2.

We have defined "aggravated battery" in this context to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder."  Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979); see also Walker, 258 Va. at 71-72, 515 S.E.2d at 575 (1999) (finding that multiple gunshot wounds, any one of which could have been fatal, constitute an "aggravated battery"); Sheppard v. Commonwealth, 250 Va. 379, 392, 464 S.E.2d 131, 139 (1995), cert. denied, 517 U.S. 1110 (1996) (finding an aggravated battery where there were multiple gunshot wounds and "an appreciable lapse of time" between the first and last shots, and when death does not result "instantaneously" from the first).  The evidence was sufficient to prove that Winston shot Anthony Robinson at least seven times, and then went upstairs and shot Rhonda Robinson three times in an execution-style fashion in front of her two daughters.

4.  Hearsay and Unadjudicated Conduct

Winston asserts in assignment of error 67 that the trial court "erred in admitting hearsay evidence at a capital murder sentencing."  We have previously held that a post-sentence

75

report made pursuant to Code § 19.2-264.5 may contain hearsay statements. Remington, 262 Va. at 354-355, 551 S.E.2d at 633. A fair reading of Winston's argument does not implicate such a report; rather, it focuses upon evidence of unadjudicated conduct introduced pursuant to Code § 19.2-264.3:2.

After the jury had completed all of its deliberations and had been discharged, the trial court conducted its sentencing hearing. At the hearing, the court permitted introduction of evidence of unadjudicated conduct over Winston's objection. The testimony concerned Winston's behavior in the Blue Ridge Regional Jail. When Winston objected to the testimony, the trial court stated, "Isn't it normally admissible in a sentencing proceeding?" Counsel for Winston replied, "Well, certainly, it's in the discretion of the Court. Most sentencing hearings aren't normally about someone's life. And so we would suggest to the Court that in light of the stakes involved in the case that the Court not permit it." Counsel cites no legal authority to support this argument. The trial court did not abuse its discretion in permitting evidence of Winston's unadjudicated conduct.

F. Post-Sentencing

1. Burden of Proof on Motion to Set Aside

With respect to the post-sentencing phase of the trial, Winston claims the "trial court erred when it required [him] to

76

present evidence justifying setting aside a sentence of death."

(A.E. 68).  This assignment of error is waived because it was

not raised at the trial court below.  Rule 5:25.

### 2.  Reconsideration of Motions Previously Denied

Winston claims that the trial court "erred in failing to

reconsider motions it previously denied."  (A.E. 64).  We

review a trial court's denial of a motion to reconsider for an

abuse of discretion.  Murphy v. Commonwealth, 246 Va. 136, 148,

431 S.E.2d 48, 55, cert. denied, 510 U.S. 928 (1993).  After

reviewing the record, we find no abuse of discretion by the

trial court with regard to Winston's motion to reconsider.

### G.  Proportionality Review

Code § 17.1-313 requires us to conduct a proportionality

review of the record to determine "[w]hether the sentence of

death was imposed under the influence of passion, prejudice or

any other arbitrary factor," Code § 17.1-313(C)(1), and

"[w]hether the sentence of death is excessive or

disproportionate to the penalty imposed in similar cases,

considering both the crime and the defendant."  Code § 17.1-

313(C)(2).  Pursuant to this statute, only this Court is

required to conduct the proportionality review, Code § 17.1-

313(A), and we do so in order "to assure the fair and proper

application of the death penalty statutes in this Commonwealth

77

and to instill public confidence in the administration of justice." Akers v. Commonwealth, 260 Va. 358, 364, 535 S.E.2d 674, 677 (2000), cert. denied, 531 U.S. 1205 (2001).

The proportionality review is entirely a creature of statute, and is not required by either the Constitution of Virginia or the Constitution of the United States. Roach v. Angelone, 176 F.3d 210, 216–17 (4th Cir. 1999) (citing Pulley v. Harris, 465 U.S. 37, 50–51 (1994)), cert. denied, 528 U.S. 965 (1999), and habeas corpus denied, 258 Va. 537, 522 S.E.2d 869 (1999). In conducting the review, we review the evidence and all reasonable inferences that are fairly deducible in the light most favorable to the Commonwealth, the prevailing party below. Chabrol v. Commonwealth, 245 Va. 327, 329, 427 S.E.2d 374, 375 (1993). While we strive " 'to reach a reasoned judgment regarding what cases justify the imposition of the death penalty,' " Hudson v. Commonwealth, 267 Va. 29, 34–35, 590 S.E.2d 362, 365 (2004) (quoting Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000)), we do not insure complete symmetry among all death penalty cases. Hudson, 267 Va. at 35, 590 S.E.2d at 365.

Winston makes five assignments of error regarding the proportionality review. Winston claims the trial court "erred by failing to conduct a pretrial proportionality review" and that the trial court "erred when it failed to conduct a

78

proportionality review that included capital cases which did not result in a sentence of death." (A.E. 10 and 66). As previously discussed, it is the responsibility of this Court, not a trial court, to conduct the proportionality review. Thus, these assignments of error are without merit.

Winston claims that "[t]he sentence of death was erroneous in that it was imposed under the influence of passion, prejudice, and/or other arbitrary factors." (A.E. 69). In support of this assignment of error, Winston cites the testimony of Niesha Whitehead and the evidence of Rhonda Robinson's pregnancy.

We have previously determined Niesha's testimony and evidence of Rhonda Robinson's pregnancy to be admissible. Winston further asserts that the same evidence caused the death sentences to be imposed under the influence of "passion." We find no merit to Winston's claims. Niesha was an eyewitness to the offenses. Certainly, the fact that she was nine years old at the time of her testimony, standing alone, cannot support a claim that the jury was improperly influenced by passion. A review of her testimony does not reveal anything other than a recitation of what she observed. The Commonwealth's argument to the jury was not improper.

With regard to evidence of Rhonda Robinson's pregnancy, the Commonwealth introduced the evidence for the purpose of

rehabilitating a witness and the Commonwealth did not appeal to passion in its arguments to the jury on the subject.  Upon review of the record, we are satisfied that the jury verdict was not imposed under the influence of passion, prejudice and/or other arbitrary factors.

Winston's remaining two assignments of error concerning proportionality review are related.  Winston argues the sentence of death was erroneous because it was "excessive and/or disproportionate to the penalty imposed in other cases charged as capital murder," and that it is error "to conduct a proportionality review which fails to examine similar capital cases resulting in life or conviction on lesser included offenses."  (A.E. 70 and 71).

In conducting the mandatory proportionality review, our responsibility is to examine the sentence of death to ensure that the sentence was not imposed due to some improper passion, prejudice, or arbitrariness and to ensure that the sentence is not excessive when compared to similar cases.  Code § 17.1-313.  Subsection E of Code § 17.1-313 provides in part that:

> The Supreme Court may accumulate the records of all capital felony cases tried within such period of time as the court may determine.  The Court shall consider such records as are available as a guide in determining whether the sentence imposed in the case under review is excessive.

When we conduct our statutory proportionality review, the records that are available to us as a guide are appellate in nature and include cases where a life sentence was imposed. See Powell, 267 Va. at 148, 590 S.E.2d at 562.

Before conducting our proportionality review, we must respond to Winston's attempt to incorporate arguments made below by mere reference in his brief. Winston's attorneys state that Winston "also relies on motions, memoranda, and argument submitted to the trial court and contained in the record." We have repeatedly rejected attempts by a party to incorporate by reference arguments made in another court or in another case. See Schmitt, 262 Va. at 138, 547 S.E.2d at 194; Burns v. Commonwealth, 261 Va. 307, 319, 541 S.E.2d 872, 881, cert. denied, 534 U.S. 1043 (2001); Hedrick v. Commonwealth, 257 Va. 328, 336, 513 S.E.2d 634, 638-39, cert. denied, 528 U.S. 952 (1999); Pulliam v. Coastal Emergency Servs., Inc., 257 Va. 1, 20 n.12, 509 S.E.2d 307, 318 n.12 (1999); Williams, 248 Va. at 537, 450 S.E.2d at 372. We adhere to these prior rulings. Attempts to incorporate arguments by reference are rejected and will not be recognized by the Court.

We have reviewed the capital murder cases where a defendant killed more than one person as part of the same act or transaction, and cases where a killing took place in the commission of a robbery or attempted robbery, and where the

81

death penalty was given based upon the aggravating factors of vileness and future dangerousness. See, e.g., Emmett v. Commonwealth, 264 Va. 364, 569 S.E.2d 39 (2002), cert. denied, 538 U.S. 929 (2003); Cherrix v. Commonwealth, 257 Va. 292, 513 S.E.2d 642, cert. denied, 528 U.S. 873 (1999); Bramblett v. Commonwealth, 257 Va. 263, 513 S.E.2d 400, cert. denied, 528 U.S. 952 (1999); Goins, 251 Va. at 469-70, 470 S.E.2d at 131-32; Stewart v. Commonwealth, 245 Va. 222, 427 S.E.2 394, cert. denied, 510 U.S. 848 (1993); Davidson v. Commonwealth, 244 Va. 129, 419 S.E.2d 656, cert. denied, 506 U.S. 959 (1992). We have also considered cases in which defendants received life sentences, rather than the death penalty, for capital murder during the commission of an attempted robbery. See, e.g., Commonwealth v. Gregory, 263 Va. 134, 557 S.E.2d 715, cert. denied, 537 U.S. 838 (2002); Burlile v. Commonwealth, 261 Va. 501, 544 S.E.2d 360 (2001). After such review, we find that Winston's sentence was not excessive or disproportionate to the sentences imposed by other sentencing bodies in the Commonwealth in comparable cases.

## III. Conclusion

Having found no error in the judgment below and finding no other reason to commute or set aside the three death sentences, we will affirm the judgment of the trial court.

Affirmed.