# COURT OF APPEALS OF VIRGINIA

## Record No. 1617-24-1

BLAKE DARVIN HUGHES, A/K/A
BLAKE DARIN HUGHES
v.
COMMONWEALTH OF VIRGINIA

Present: Judges Athey, Friedman and Callins

Argued at Williamsburg, Virginia

Opinion Issued May 12, 2026

## FROM THE CIRCUIT COURT OF VIRGINIA BEACH
Scott Joseph Flax, Judge

Monica Tuck, Assistant Public Defender (Virginia Indigent Defense Commission, on briefs), for appellant.

Catherine E. Spencer, Assistant Attorney General (Susan Hallie Hovey-Murray, Assistant Attorney General; Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## JUDGE CLIFFORD L. ATHEY, JR.

Following a bench trial, the Circuit Court of the City of Virginia Beach ("trial court") convicted Blake Darvin Hughes ("Hughes") of impersonating a police officer, abduction, and assault and battery. On appeal, Hughes challenges the sufficiency of the evidence in support of each of his convictions. Finding no error, we affirm.

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

I. BACKGROUND[2]

Hughes was indicted for impersonating a police officer, in violation of Code § 18.2-174; abduction, in violation of Code § 18.2-47; and assault and battery, in violation of Code § 18.2-57. After being deemed competent to stand trial, Hughes's bench trial commenced on July 1, 2024.

Following opening statements, Abby Laurendeau ("Laurendeau"), the victim, testified that on November 5, 2023, after her work shift ended at a restaurant in Virginia Beach, she walked at approximately 9:13 p.m. to her white Subaru automobile that was parked in the parking lot behind the restaurant. Hughes—at that time a stranger who worked at the restaurant located on the other side of the parking lot—was sitting in the driver's seat of his gold minivan, which was parked directly behind Laurendeau's car. When she approached her Subaru, the minivan's brake lights became illuminated. No other lights were, at that time, emanating from Hughes's minivan.

Laurendeau further testified that when she started driving out of the parking lot in her Subaru, Hughes immediately followed her in his minivan. She explained that she did not recognize the van and only thought that another restaurant employee was also leaving work. When Laurendeau turned out of the parking lot, she noticed that red and blue lights "immediately" began flashing behind her coming from Hughes's minivan. She then thought she was "getting pulled over" because "[r]ed and blue lights typically mean police."

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Additionally, "[p]ortions of the record in this case are sealed." *R.T. v. Commonwealth*, 86 Va. App. 293, 295 n.2 (2025) (quoting *Perkins v. Commonwealth*, 84 Va. App. 519, 524 n.4 (2025)). "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts." *Id.* (quoting *Perkins*, 84 Va. App. at 524 n.4).

Laurendeau further explained that she "pulled over at the stop sign" just ahead of her and was somewhat confused because the lights began flashing "right out of the gate[,] right out of work." However, she testified that she saw "police lights," so she stopped, lowered her window, and waited. Hughes then exited his minivan and began walking toward her vehicle from behind. She described Hughes as wearing a baggy T-shirt and jeans and that once he reached her window, she realized that he was not a police officer. She recalled that Hughes was "laughing" as he approached her and stated, "I'm sorry. I'm sorry. I just wanted to see if it would work. Haha. I'm sorry. I'm sorry."

Laurendeau acknowledged that she was probably laughing at that point as well but out of "shock" and "fear." She testified that she was afraid because a "random" man whom she had never met was at her "window pretending to be a police officer." She explained that she "didn't understand what was happening" and experienced "fear of the unknown." She then explained that, after Hughes finished laughing, he "reached in the car and gave [her] a hug to apologize." Laurendeau testified that she was "frozen in fear," so she did not "refuse" the hug. She testified that she did not want to be hugged because she was "scared" and "terrified." Laurendeau further testified that she drove away after Hughes "backed out" of her window. She added that she was still afraid after leaving and took an alternate route home so that Hughes could not learn where she lived. According to Laurendeau, her interaction with Hughes lasted less than one minute.

Laurendeau then explained that she did not immediately contact the police because she was "shaken up" and only wanted to get home and be with her dog. However, one of her coworkers witnessed the event and reported the incident to Laurendeau's boss. Her boss then talked it over with Laurendeau the next day and called the police. Laurendeau noted that she "probably" would have called the police had her boss not done so.

The Commonwealth then called Virginia Beach Police Officer Dustin Morris ("Officer Morris"). Officer Morris recalled speaking to Hughes the day after the incident. Officer Morris testified that the red and blue lights were in Hughes's apartment, which Officer Morris seized with Hughes's consent. Hughes also initially told him that he had never left his car during the incident. The Commonwealth also introduced footage from several security cameras depicting much of Laurendeau's encounter with Hughes. For example, surveillance cameras recorded Hughes as he parked his gold minivan in the shared parking lot around 5:50 p.m. while the red and blue lights were visibly flashing from inside his windshield. Video security footage also showed Laurendeau's Subaru and Hughes's minivan beginning to depart from the parking area simultaneously. Moreover, the video security footage showed Laurendeau stopping at the stop sign with Hughes closely trailing behind her in his minivan. Finally, the security footage depicted Hughes walking up to Laurendeau's vehicle and, after less than a minute, walking back to his minivan, after which both vehicles left the area.

At the close of the Commonwealth's case-in-chief, Hughes moved to strike each charge, contending that the Commonwealth failed to prove he impersonated a police officer, abducted Laurendeau, or assaulted her. Counsel for Hughes claimed that the evidence only showed that Hughes "got out of a minivan in plain clothes after . . . [Laurendeau] stopped at a stop sign," he "didn't tell her he was an officer" nor "act like" one, and he "didn't pretend that it was a traffic stop." He further claimed that the evidence failed to establish that Hughes intended to deprive Laurendeau of her personal liberty because he never directed Laurendeau to get out of her vehicle, nor did he ever step "in front of her car" and "prevent her" from leaving. Finally, he claimed that the testimony only established that there "may have been a very quick hug" and "[t]here's been no allegation of any violence or injury or threat in that interaction" that would

- 4 -

support a conviction for assault and battery. The trial court denied the motions to strike each of the charges.[3]

Hughes, who was a convicted felon, then testified in his own defense. He claimed that on the night of the incident he was "messing with" the red and blue lights as he arrived at the restaurant around 6:00 p.m. because he had "just got them" about a week earlier and wanted "to see how they worked." He further claimed that he had purchased the lights because they were intended to replace the "yellow and white" lights he used on "construction sites." Hughes further explained that the lights were "supposed to be . . . multifunction," so by "messing with" the lights, he was trying to "switch" the colors.

Hughes acknowledged that he had been sitting in his van for nearly an hour before Laurendeau entered her Subaru to depart for home. He denied, however, that he had been waiting specifically for her or that he intended to follow her, testifying that it was just a coincidence that they left at the same time. He then testified that he had been on his phone as he continued "messing with" the lights because they had stopped working. He then claimed that as he "switched the plug-in . . . to a different plug-in," the red and blue lights came on, and Laurendeau stopped at the stop sign in front of him. Hughes testified that he got out of his van, approached Laurendeau, apologized, and said, "I didn't mean to scare you. I was just trying to see if the lights worked." He denied both leaning into the driver's window of her car and touching her. He further denied that he intended to "stop" Laurendeau or "make her think [he] w[as] a police officer," though he acknowledged that red and blue lights are "associate[d]" with police officers. He claimed that he was intoxicated when the police interviewed him, which was why he told them he never got out of his car.

---

[3] Hughes was also charged with one count of driving on a suspended driver's license, but the trial court granted his motion to strike the charge.

Following the closing arguments of counsel, the trial court convicted Hughes of impersonating a police officer, abduction, and assault and battery. When explaining its reasoning, the trial court stated that it rejected Hughes's account of what transpired that night. The trial court also noted that Hughes's felony conviction weighed against his credibility and further found that his trial testimony was "drastically different" from the prior statements he gave to law enforcement.

The trial court then addressed the charge that Hughes impersonated a police officer, specifically stating that a person is guilty of this crime when they "falsely assume[] or exercise[] the functions, powers, duties, and privileges incident to" a police officer. The trial court further opined, after citing Code § 46.2-1022,[4] that there was not "any question that once he activate[d] these lights, he[] [was] impersonating a law enforcement officer" and that he did not have "any right to be activating these lights." In addition, the trial court rejected Hughes's claim that he was "just testing" the lights. Moreover, the trial court opined that Hughes had abducted Laurendeau by deceiving and "seiz[ing]" her during the traffic stop. The trial court found that Hughes had intended to see if he could "pull someone over," as demonstrated by his statement that he wanted to "see if it would work." Finally, the trial court found that Hughes approached Laurendeau's car and engaged in an "unwanted touching."

Following the preparation of a pretrial sentencing report, the trial court conducted a sentencing hearing after which Hughes was sentenced to 6 years' incarceration for abduction, 12 months' incarceration for impersonation of a law enforcement officer, and 6 months' incarceration for assault and battery. The trial court suspended all but two years and seven

---

[4] Code § 46.2-1022 provides that only "law-enforcement vehicles," certain "Department of Corrections vehicles," and Virginia National Guard vehicles when "used in state active duty to perform particular law-enforcement functions," "may be equipped with flashing, blinking, or alternating blue, blue and red, blue and white, or red, white, and blue combination warning lights."

months of the sentence on the condition that Hughes be placed on five years of supervised probation following completion of his active sentence and that he have no further contact with Laurendeau.  Hughes appealed.

## II.  ANALYSIS

### A.  *Standard of Review*

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one."  *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).  "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'"  *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680).  However, "[m]atters of statutory interpretation present pure questions of law" and "are reviewed de novo on appeal."  *Commonwealth v. Delaune*, 302 Va. 644, 655 (2023).

### B.  *There was sufficient evidence to convict Hughes of impersonating a police officer.*

Hughes contends that the evidence failed to prove that he committed the "requisite conduct" to sustain his conviction for impersonating a law enforcement officer because he neither "assumed" a "privilege incident" to a law enforcement officer nor "pretended to be" a law enforcement officer.  In the alternative, he further maintains that the Commonwealth failed to prove that he had the "requisite intent" to sustain his conviction under Code § 18.2-174.

"Any person who falsely assumes or exercises the functions, powers, duties, and privileges incident to the office of sheriff, police officer, marshal, or other peace officer . . . , or who falsely assumes or pretends to be any such officer, is guilty of a Class 1 misdemeanor."  Code § 18.2-174.

> Under the plain language of this statute, a person can be convicted for impersonating a police officer if he does one of two things (or a combination of both): (1) he falsely exercises the privileges "incident to" one's position as a law enforcement officer (the "privileges clause") or (2) he falsely "assumes or pretends" to be a law enforcement officer (the "pretending clause").

*Morgan v. Commonwealth*, 73 Va. App. 512, 525 (2021) (quoting Code § 18.2-174), *rev'd on other grounds*, 301 Va. 476, 485 (2022). A violation of either clause constitutes an offense under the statute. *Id.*

Here, Hughes was convicted under Code § 18.2-174's privileges clause. No Virginia appellate court has applied the privileges clause when reviewing a conviction obtained pursuant to Code § 18.2-174. *See, e.g.*, *Morgan*, 73 Va. App. at 531 (sustaining a conviction through the pretending clause); *English v. Commonwealth*, 43 Va. App. 370, 373 (2004) (same); *Wallace v. Commonwealth*, No. 0223-24-1, slip op. at 10 (Va. Ct. App. Sept. 16, 2025) (same).[5] Hence, this is a matter of first impression and we must first turn to the plain text of the privileges clause to discern the conduct it criminalizes.

"When interpreting a statute . . . , 'our primary objective is "to ascertain and give effect to legislative intent," as expressed by the language used.'" *Berry v. Bd. of Supervisors*, 302 Va. 114, 127 (2023) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). "[A] statute should be read and considered as a whole, and the language of a statute should be examined in its entirety to determine the intent of the General Assembly from the words contained in the statute." *Hackett v. Commonwealth*, 78 Va. App. 92, 97 (2023) (alteration in original) (quoting *Oraee v. Breeding*, 270 Va. 488, 498 (2005)). Additionally, "[a]s with all issues of statutory interpretation, we are bound by the plain language of the statutes at issue." *Small v. Fannie Mae*, 286 Va. 119, 127 (2013). When the General Assembly does not define the statute's plain language, "the Court gives those terms 'their "ordinary meaning," in light of "the context in which [they are] used."'" *Green v. Commonwealth*, 72 Va. App. 193, 203 (2020) (alteration in original) (quoting *Va. Marine Res. Comm'n v. Chincoteague Inn*, 287 Va. 371, 384 (2014)).

---

[5] While not binding, unpublished cases may be cited as persuasive authority. *See* Rule 5A:1(f); *see also Smith v. Commonwealth*, 78 Va. App. 371, 383 n.4 (2023).

- 8 -

1. <u>Hughes's actions are within the prohibited actus reus in violation of the privileges clause.</u>

First, we must determine the actus reus covered by the privileges clause. Then we determine whether the actions of Hughes fall within the prohibited conduct.

Code § 18.2-174 criminalizes exercising a "function[], power[], dut[y] and privilege[]" incident to the office of law enforcement. Code § 18.2-174. In looking to the words' dictionary definitions, *see Green*, 72 Va. App. at 203 ("In ascertaining [an undefined term's ordinary] meaning, dictionary definitions . . . may be consulted."), the ordinary meaning of these terms overlap.[6] In looking to the clause as a whole, however, the phrase "assume[s] or exercise[s] . . . some of the functions, powers, duties, or privileges incident or belonging to the office" has been interpreted to simply mean that the defendant "takes upon himself to act as [an officer]." 2 Hascal R. Brill, *Cyclopedia of Criminal Law* § 1278 (1923). Prohibited acts under the privileges clause, rather than meeting the particularized showing for each term in the clause, must be "some sort of purported official action in the assumed character." 35 C.J.S. *False Personation* § 1. The term "privileges" captures these "purported official actions."[7] *Id.*; *see Morgan*, 73 Va. App. at 525

---

[6] A "function" is an "[a]ctivity that is appropriate to a particular profession," *Function*, *Black's Law Dictionary* (12th ed. 2024); a "power" is "[t]he legal right or authorization to act or not act," *Power*, *Black's Law Dictionary*, *supra*; a "duty" is "[a] legal obligation that is owed or due to another and that needs to be satisfied," *Duty*, *Black's Law Dictionary*, *supra*; and a "privilege" is "the legal freedom to do or not to do a given act" that "immunizes conduct that, under ordinary circumstances would subject the actor to liability," *Privilege*, *Black's Law Dictionary*, *supra*.

[7] We do not rely on the definitions of each individual term because we find that this holistic reading better encompasses the General Assembly's intent in enacting the privileges clause. *See Hackett*, 78 Va. App. at 97. To be sure, "we ordinarily resist a construction of a statute that would render part of a statute superfluous." *Loch Levan Land Ltd. P'ship v. Bd. of Supervisors*, 297 Va. 674, 685 (2019). But the canon against superfluity is "not a silver bullet." *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019). In certain circumstances, legislators sometimes incorporate redundancy to employ a "belt and suspenders approach" to legislative drafting to capture all relevant harms the statute seeks to address. *See, e.g.*, *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020) (explaining that a "redundant" phrase in CERCLA did not violate the canon against superfluity because it was "much more likely" that Congress simply wanted "to make sure that *all* CERCLA lawsuits are routed to federal court").

(distilling the privileges clause to be the "privileges" incident to the office instead of utilizing all four terms); *cf. Privilege*, *Black's Law Dictionary* (12th ed. 2024) (defining "privilege" as "the legal freedom to do or not to do a given act" that "immunizes conduct that, under ordinary circumstances would subject the actor to liability").

Hence, the privileges clause requires a showing that the defendant exercised "some sort of purported official action," or a privilege. 35 C.J.S. *False Personation* § 1. However, one must still wield a privilege that is "'incident to' one's position as a law enforcement officer." *Morgan*, 73 Va. App. at 525 (quoting Code § 18.2-174). Thus, we must next address how this statutory limitation focuses the application of the privileges clause to certain conduct.

"Incident" means, "A dependent, subordinate, or consequential part (of something else)." *Incident*, *Black's Law Dictionary*, *supra*; *see Nat'l R. Passenger Corp. v. Catlett Volunteer Fire Co.*, 241 Va. 402, 408-09 (1991) (applying the Black's Law Dictionary definition of "incident" to discern what "incident to" meant in a statute). Naturally, this indicates that the privileges clause prohibits "falsely exercis[ing] the privileges" that arise as a consequence of attaining the status of law enforcement officer and not from another source. *Morgan*, 73 Va. App. at 525. To outline what privileges arise as a consequence of being a law enforcement officer, legal doctrine pertaining to public officers is instructive.

Lawfully appointed police officers are "public officers" who enjoy the privileges that come with their office. *See Mann v. Lynchburg*, 129 Va. 453, 460 (1921). As with other public offices,

---

We find this to be the case with respect to the application of the privileges clause. Police-impersonation statutes "exist[] to protect citizens who would be harmed or deceived by those acting under the color of authority." *United States v. Chappel*, 691 F.3d 388, 392 (4th Cir. 2012) (quoting *People v. Ellis*, 696 N.E.2d 1, 3 (Ill. App. Ct. 1998)) (interpreting Code § 18.2-174). By listing very similar terms with overlapping meanings, the General Assembly sought to capture all the conduct that *could* be "incident to the office of . . . police officer." Code § 18.2-174. This better comports with the purpose of police-impersonation statutes and the overall meaning of the phrase. *See* 2 Hascal R. Brill, *supra*, § 1278.

the privileges incident to the office of law enforcement include those "created and conferred by law." 15 Michie's Jurisprudence, *Public Officers* § 2. This includes privileges that existed at common law, *see, e.g.*, 16 Michie's Jurisprudence, *Sheriffs* § 8 (citing *Commonwealth ex rel. Davis v. Malbon*, 195 Va. 368, 371 (1953)) (explaining that "at common law a sheriff was charged with the affirmative duty of preserving the peace and enforcing the law"), or those granted by statute. *See, e.g.*, Code § 46.2-1022 (providing that "flashing, blinking, or alternating blue, blue and red, blue and white, or red, white, and blue combination warning lights" may be equipped on vehicles operated by "law-enforcement"). These "[g]rants of power to public officers are usually strictly construed," establishing privileges that are only "expressly imposed or necessarily implied." 15 Michie's Jurisprudence, *supra*, § 46 (citing *Yancy v. Hopkins*, 15 Va. (1 Munf.) 419 (1810)). Still, such privileges are part and parcel of the office itself, and they cannot be exercised by someone "without any color of title" to the office. *Griffin's Ex'r v. Cunningham*, 61 Va. (20 Gratt.) 31, 43 (1870); *see Nat'l R. Passenger Corp.*, 241 Va. at 409 (holding that the statutory phrase "incident to fighting fires" impliedly encompassed firefighters "operati[ng] . . . a fire truck en route to the scene of a fire").

Thus, we hold that any person who wields the privileges "created and conferred by law" to a police officer, 15 Michie's Jurisprudence, *supra*, § 2, without having such authority—or, in other words, "without any color of title" to the office—satisfies the privileges clause's actus reus, *Griffin's Ex'r*, 61 Va. (20 Gratt.) at 43. Such actors are "mere usurper[s]" into the office of law enforcement because they exercise—without authority—one of the official and unambiguous tools available to police officers when performing their functions. *Id.* They are distinguished from those who "ha[ve] a title against the world to exercise the functions of the office." *Id.* at 43-44 (differentiating "mere usurper[s]" from "officer[s] de jure"). Rather, "[a] mere usurper is one who intrudes himself into an office" he does not hold with no claim to hold the office he purports to

occupy. *Cardenas Flores v. Commonwealth*, 84 Va. App. 495, 510 (2025) (quoting *McCraw v. Williams*, 74 Va. (33 Gratt.) 510, 513 (1880)). Ultimately, it is these "mere usurper[s]" that the privileges clause seeks to address.[8] *Griffin's Ex'r*, 61 Va. (20 Gratt.) at 43.

Here, by activating red and blue flashing lights on his gold minivan, Hughes violated the privileges clause of Code § 18.2-174. The Commonwealth showed that Hughes, who was not a police officer, wielded a privilege afforded to police officers by equipping and employing flashing red and blue lights on his vehicle. Specifically, the Commonwealth pointed to Code § 46.2-1022, which provides that "flashing, blinking, or alternating blue, blue and red, blue and white, or red, white, and blue combination warning lights" may be equipped on vehicles operated by "law-enforcement," the Department of Corrections, and the Virginia National Guard "in state active duty to perform particular law-enforcement functions." Moreover, Code § 46.2-1020 provides that "no motor vehicle that is equipped with any lighting device other than lights required or permitted in this article . . . shall be operated on any highway in the Commonwealth," further delineating that "[n]othing in this section shall permit any vehicle, not otherwise authorized, to be equipped with colored emergency lights, whether blinking or steady-burning."

Accordingly, employing red and blue lights is a privilege "created and conferred by law"—in this case, "necessarily implied" by statute—to the office of law enforcement. 15 Michie's

---

[8] It bears emphasizing that the privileges clause requires no special appearance or acts of pretend; it requires taking advantage of the legal privileges of law enforcement, irrespective of whether the defendant affixes a badge, wears a uniform, or simply acts the part. *Cf. Morgan*, 73 Va. App. at 530-31 (affirming a defendant's conviction under the pretending clause). We recognize that there will often be overlap between the privileges and pretending clauses—someone who "falsely 'assumes or pretends' to be a law enforcement officer" will likely "falsely exercise[] the privileges 'incident to' one's position as a law enforcement officer." *Id.* at 525; *see, e.g.*, Code § 18.2-175 (criminalizing the fraudulent wearing of, inter alia, law enforcement uniforms). But this does not cast doubt on the operative inquiry for discerning whether the privileges clause's actus reus is satisfied: whether someone wields a privilege "created and conferred by law" to a police officer, 15 Michie's Jurisprudence, *supra*, § 2, "without any color of title" to the office, *Griffin's Ex'r*, 61 Va. (20 Gratt.) at 43.

Jurisprudence, *supra*, §§ 2, 46. The statutes permit police officers, not the general public, to affix these lights onto their vehicles, and the authority to use them flows from the authority to affix them. *Cf.* 1976 Va. Att'y Gen. 185, 186 (citing the prior version of Code §§ 46.2-1020, -1022, and opining that it did not permit fire department vehicles to "use" blue lights).[9] So when Hughes exercised this privilege while not being a police officer, the statute's actus reus was satisfied.[10]

Hughes contends that while Code § 46.2-1022 does permit law-enforcement vehicles to use red and blue lights, such permission does not amount to a "privilege" because "the use of blue and red lights is not **exclusive** to" police officers. However, whether something is a privilege does not necessarily turn on whether police officers are the *sole* group permitted to wield it. To be sure, this often will mean that only law enforcement may wield their privileges, but this is not necessarily true. *See, e.g.*, *Hudson v. Commonwealth*, 266 Va. 371, 376 n.3 (2003) (recognizing that "citizen's arrests," which permit private citizens to "arrest . . . private person[s]," are permissible under Virginia law under particular circumstances). And ultimately, the operative inquiry is not whether the privilege is *exclusive* to law enforcement; it is instead whether the privilege is something "*created and conferred by law*" to the *office* of law enforcement, and whether someone exercises

---

[9] "While it is not binding on this Court, an [o]pinion of the Attorney General is 'entitled to due consideration.'" *Emmanuel Worship Ctr. v. Petersburg*, 80 Va. App. 100, 117 n.11 (2024) (quoting *Beck v. Shelton*, 267 Va. 482, 492 (2004)).

[10] We further note that multiple Attorney General opinions have endorsed this interpretative approach to the privileges clause. A 2019 opinion of the Attorney General explained that armed private militia members standing outside government buildings could violate the privileges clause because they would "usurp a role specifically reserved to law enforcement" under Code § 15.2-1704(A) by "engaging in crowd control or purporting to secure a public area." 2019 Op. Va. Att'y Gen. 81, 84. The next year, another opinion of the Attorney General endorsed this application for militia members intimidating voters at polling places. 2020 Op. Va. Att'y Gen. 53, 56. Crucially, both opinions support our holding that privilege-clause violations occur when someone, without official authority, wields a privilege afforded to law enforcement by statute. And by not amending the privileges clause after the issuance of these opinions, the General Assembly accordingly has not foreclosed our interpretation of the clause. *See Emmanuel Worship Ctr.*, 80 Va. App. at 117 n.11 (2024).

that privilege when they have no authority to do so. 15 Michie's Jurisprudence, *supra*, § 2 (emphasis added). So Hughes's contention is unavailing.

Code §§ 46.2-1020, -22 enable law enforcement to do something that the general public cannot do: affix and activate flashing blue and red lights on their vehicles. When Hughes affixed and activated his red and blue lights on his gold minivan, he was a "mere usurper" into the office of law enforcement as he exercised this privilege "without any color of title" to the office. *Griffin's Ex'r*, 61 Va. (20 Gratt.) at 43. Therefore, the evidence was sufficient to prove that Hughes's acts violated the privileges clause.

2. Hughes possessed the requisite intent for a violation of Code § 18.2-174.

We now turn to whether there was sufficient evidence to show that Hughes satisfied the statute's mens rea element.

Crimes with a mens rea element can be categorized as having one of two types of intent: specific intent or general intent. *Winston v. Commonwealth*, 268 Va. 564, 600 (2004). "Specific intent is the intent to accomplish the precise criminal act that one is later charged with," while "[g]eneral intent is the intent to perform an act even though the actor may not desire the consequences that result." *Id.* "Specific intent . . . must be explicitly found in the statute's language in order to establish such intent as an element of an offense." *Johnson v. Commonwealth*, 37 Va. App. 634, 640 (2002). By contrast, "[i]f a statute does not require a specific intent, a general criminal intent is still required." *Rompalo v. Commonwealth*, 72 Va. App. 147, 158 (2020).

No Virginia appellate court has addressed whether Code § 18.2-174 requires the Commonwealth to prove that a defendant had "the *specific intent* to *deceive* another into believing he is a law enforcement officer." *Morgan*, 73 Va. App. at 526 (expressing uncertainty on the resolution of this question). But we have no occasion to answer it here because even if the statute contains a specific intent element, the evidence against Hughes "is sufficient to show that he not

- 14 -

only generally intended to give himself the appearance of being a police officer, but that it was his specific intent to deceive others into believing he possessed that status." *Id.* at 526-27 ("assuming without deciding" that Code § 18.2-174 contained a specific intent element and holding that the evidence was sufficient to prove that intent).[11]

Here, the record established that Hughes used flashing red and blue lights to effectively initiate a traffic stop. Hughes also told Laurendeau what his intention was—he wanted to see if "it" would work. The trial court found that Hughes's statement revealed that he had intended to see if he could "pull someone over" by deceiving them into thinking that he was a police officer. Based on the above circumstances, that finding was not plainly wrong. *See Mason v. Commonwealth*, 49 Va. App. 39, 45 (2006) ("Whether the required intent exists is generally a question for the trier of fact." (quoting *Crawley v. Commonwealth*, 25 Va. App. 768, 773 (1997))). The trial court was also not required to credit Hughes's claims that he did not intend to pull Laurendeau over given the court rejected Hughes's testimony regarding his encounter with Laurendeau and Hughes's felony convictions weighed against his credibility. *See Carosi v. Commonwealth*, 280 Va. 545, 554-55 (2010); *see also Reed v. Commonwealth*, 6 Va. App. 65, 68 (1988) (providing that testimony may be impeached by a prior felony conviction). Hence, there was sufficient evidence to prove that Hughes had the specific intent to deceive Laurendeau into thinking he was a police officer.

Therefore, because the evidence showed that Hughes satisfied the actus reus and mens rea of the privileges clause, we conclude that the evidence was sufficient to convict Hughes of impersonating a police officer.

---

[11] "[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)). Indeed, "a degree of judicial caution should accompany any holding that reaches out beyond the limits of the particular case to address unnecessary and novel issues." *Id.* at 397.

C. *There was sufficient evidence to support Hughes's conviction for abduction.*

Next, Hughes challenges the sufficiency of the evidence to support his abduction conviction, asserting that he did not intend to deprive Laurendeau of her "personal liberty." We disagree.

Abduction is the unjustified "tak[ing], transport[ing], detain[ing] or secret[ing]" of another person by means of "force, intimidation or deception . . . with the intent to deprive such other person of [her] personal liberty." Code § 18.2-47(A). "To prove that the defendant intended to deprive the victim of her personal liberty, the Commonwealth must prove that the defendant intended to deny the victim her freedom from bodily restraint." *Burton v. Commonwealth*, 281 Va. 622, 627 (2011). "Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances." *Howard v. Commonwealth*, 207 Va. 222, 228 (1966). As such, it "can be evidenced . . . by the words or conduct of the person who is claimed to have entertained it." *Brown v. Commonwealth*, 74 Va. App. 721, 733-34 (2022) (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)).

Here, the Commonwealth's evidence sufficiently showed that Hughes did not merely deceive Laurendeau but also acted with the intent to deprive her of her personal liberty. He specifically told Laurendeau—after pulling her over, getting out of his vehicle, and walking up to her driver's side window—that "he wanted to see if it would work," which was an affirmative statement of his intent to stop Laurendeau from driving home. Further, Hughes's intent was evidenced by his false claim to law enforcement that he never exited his vehicle after stopping Laurendeau. The factfinder could rationally determine that the false account was an attempt "to conceal his guilt." *Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008).

Additionally, Hughes's intent can be inferred from the means of his deception: impersonating a police officer—a public officer whose authority regularly compels the public to

- 16 -

restrict their movements. *See Hughes v. Commonwealth*, 18 Va. App. 510, 519 (1994) (indicating that intent can be inferred from natural consequences of defendant's actions). A reasonable factfinder could conclude that the natural and probable consequences of Hughes's conduct was that Laurendeau's liberty would be restricted when red and blue flashing lights appeared behind her as she was driving home from work. *See, e.g.*, *Clarke v. Commonwealth*, 32 Va. App. 286, 298 (2000) ("[W]hen a police officer signals a motorist with his flashing lights, a reasonable motorist would conclude that he must comply with the officer's authority and stop."). Indeed, if the traffic stop had been instituted by an actual police officer, Laurendeau could not have disregarded the flashing blue and red lights without risking criminal liability. *See* Code § 46.2-817 (prohibiting the "willful and wanton disregard" of "a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop"). Thus, in addition to the Commonwealth's evidence of Hughes's intent by and through his statements, it was "entirely 'permissible to infer,' as the trial court did, 'that [Hughes] intend[ed] the natural and probable consequences of'" impersonating a police officer: that Laurendeau's personal liberty would be deprived. *Walker v. Commonwealth*, 47 Va. App. 114, 121 (2005).

Thus, under the specific facts and circumstances of this case, the trial court reasonably inferred that Hughes intended to "deprive [Laurendeau] of [her] personal liberty." Code § 18.2-47(A). Therefore, we affirm the trial court's judgment on this issue.

D. *The evidence was sufficient to support Hughes's conviction for assault and battery.*

Finally, Hughes contests his assault and battery conviction, contending that the evidence did not prove that he had an "unlawful intent." We disagree.

"To sustain a conviction for battery, the Commonwealth must prove a 'wil[l]ful or unlawful touching' of another." *Parish v. Commonwealth*, 56 Va. App. 324, 330 (2010) (alteration in original) (quoting *Wood v. Commonwealth*, 149 Va. 401, 404 (1927)). "Whether a touching is a

battery, depends on the intent of the actor, not the force applied." *Yellock v. Commonwealth*, 79 Va. App. 627, 641 (2024) (quoting *Parish*, 56 Va. App. at 330). That intent can be "either an actual intention or an intention imputed by law." *Parish*, 56 Va. App. at 330 (quoting *Adams v. Commonwealth*, 33 Va. App. 463, 468 (2000)).

One way the requisite intent may be imputed to the defendant is when "the touching is 'done in a rude, insolent, or angry manner.'" *Id.* at 331 (quoting *Adams*, 33 Va. App. at 469). "[R]ude" contact is "'offensive in manner or action,' 'marked by a lack of gentleness or by the use of force,' or 'sudden and disconcerting or unpleasant.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 628 n.4 (2019) (quoting *Rude*, *Webster's Third New International Dictionary* (2002)). "Whether an act is done in a 'rude, insolent, or angry manner' is a finding of fact that this Court will not disturb on appeal unless the finding is plainly wrong or no evidence supports it." *Id.* at 628-29 (quoting *Parish*, 56 Va. App. at 329, 332).

Here, a rational factfinder could find that Hughes committed a rude touching. After pulling over Laurendeau, Hughes exited his vehicle, approached her car, reached inside the vehicle, and hugged her. Laurendeau was "terrified" and "frozen in fear." A rational factfinder could conclude that a stranger reaching inside one's vehicle to wrap their arm around the occupant is a rude act, especially when done at night. *Cf.* William L. Prosser, *Handbook of the Law of Torts* 47 (1941) ("A stranger is not to be expected to tolerate liberties which would be allowed by an intimate friend."). But not only was this a hug by a stranger on the roadside at night—it was a hug by a stranger who deceived her into believing he was a police officer by employing red and blue flashing lights. *Cf. Ferguson v. Commonwealth*, 71 Va. App. 546, 560 (2020) (recognizing that having "a position of authority and influence" over another can involve "inherent coercion"). A hug from such a person could hardly be considered a "friendly gesture," but in any case, the factfinder is in the best position to determine whether the hug was rude, based on the characterization of the testimony

- 18 -

adduced at trial. *See Walton v. Commonwealth*, 255 Va. 422, 426 (1998) ("Great deference must be given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony."). Accordingly, the court, after considering the surrounding circumstances, was not "plainly wrong" to conclude that the hug was given in a rude manner. *Kelley*, 69 Va. App. at 628-29.

Finally, that Laurendeau acquiesced to Hughes's hug does not affect this conclusion. True, a consented touching is generally not a battery, *see Banovitch v. Commonwealth*, 196 Va. 210, 219 (1954), but it does not follow that a touching is always lawful because the victim did not explicitly object to it. "Submission to an act through fear is not consent." 1 William L. Clark & William L. Marshall, *Treatise on the Law of Crimes* § 212 (4th ed. 1940). And crucially, the Commonwealth showed that Laurendeau's failure to object was not because she consented to the hug; she failed to object because she was "frozen in fear" due to a "random" man—whom she had never met—standing at her "window pretending to be a police officer." Thus, even without an express protest by Laurendeau, the trial court could still reasonably find that, given the circumstances of their interaction, Hughes's contact was rude, thereby imputing onto him an unlawful intent.

Accordingly, we cannot say that the trial court was plainly wrong in finding that the unwanted hug was a rude touching due to the attendant circumstances surrounding Hughes's conduct. *See Kelley*, 69 Va. App. at 628-29. Thus, the evidence was sufficient to sustain his assault and battery conviction.

### III. CONCLUSION

We conclude that the Commonwealth presented sufficient evidence to support Hughes's convictions. The Commonwealth sufficiently proved that Hughes, with the requisite unlawful intent, "exercise[d] the functions, powers, duties, and privileges incident to the office of . . . police

officer," Code § 18.2-174, because he wielded a privilege "created and conferred by law" to the office of law enforcement, 15 Michie's Jurisprudence, *supra*, § 2, "without any color of title" to the office, *Griffin's Ex'r*, 61 Va. (20 Gratt.) at 43. Additionally, there was sufficient evidence to show that Hughes detained Laurendeau with the intent "to deprive [Laurendeau] of [her] personal liberty," and, therefore, we uphold the trial court's conviction of Hughes for abduction. Code § 18.2-47(A). Finally, the Commonwealth sufficiently showed that Hughes had the requisite intent to be convicted of assault and battery. *See Parish*, 56 Va. App. at 330-31. For these reasons, the trial court's judgment is affirmed.

*Affirmed.*